KING, COMMISSIONER, DEPARTMENT OF PEN-
SIONS AND SECURITY, ET AL. *v.* SMITH ET AL.

No. 949.   Argued April 23, 1968.—Decided June 17, 1968.

*Mary Lee Stapp,* Assistant Attorney General of Alabama, argued the cause for appellants. With her on the briefs were *MacDonald Gallion,* Attorney General, and *Carol F. Miller,* Assistant Attorney General.

*Martin Garbus* argued the cause and filed a brief for appellees.

Briefs of *amici curiae,* urging affirmance, were filed by *Jack Greenberg, James M. Nabrit III, Leroy D. Clark,* and *Charles Stephen Ralston* for the NAACP Legal Defense and Educational Fund, Inc., et al., and by *Helen L. Buttenwieser* and *Ephraim London* for the Child Welfare League of America, Inc., et al.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

Alabama, together with every other State, Puerto Rico, the Virgin Islands, the District of Columbia, and Guam, participates in the Federal Government's Aid to Families With Dependent Children (AFDC) program, which was established by the Social Security Act of 1935.[1]   49 Stat. 620, as amended, 42 U. S. C. §§ 301–1394.   This appeal presents the question whether a regulation of the Alabama Department of Pensions and Security, employed in that Department's administration of the State's federally funded AFDC program, is consistent with Subchapter IV of the Social Security Act, 42 U. S. C. §§ 601–609, and with the Equal Protection Clause of the Fourteenth Amendment.   At issue is the validity of Alabama's so-called "substitute father" regulation which denies AFDC payments to the children of a mother who "cohabits" in or outside her home with any single or married able-bodied man.   Appellees brought this class action against appellants, officers, and members of the Alabama Board of Pensions and Security, in the United States District Court for the Middle District of Alabama, under 42 U. S. C. § 1983,[2] seeking declaratory and injunctive relief.   A properly convened three-judge Dis-

---

[1] The program was originally known as "Aid to Dependent Children."   49 Stat. 627.   Alabama's program still bears this title.   In the 1962 amendments to the Act, however, the name of the program was changed to "Aid and Services to Needy Families With Children," 76 Stat. 185.   Throughout this opinion, the program will be referred to as "Aid to Families With Dependent Children," or AFDC.

[2] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

trict Court [3] correctly adjudicated the merits of the controversy without requiring appellees to exhaust state administrative remedies,[4] and found the regulation to be inconsistent with the Social Security Act and the Equal Protection Clause.[5]   We noted probable jurisdiction, 390

[3] Since appellees sought injunctive relief restraining the appellant state officials from the enforcement, operation, and execution of a statewide regulation on the ground of its unconstitutionality, the three-judge court was properly convened pursuant to 28 U. S. C. § 2281.  See *Alabama Public Service Comm'n* v. *Southern R. Co.,* 341 U. S. 341, 343, n. 3 (1951).  See also *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73 (1960); *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535 (1954).  Jurisdiction was conferred on the court by 28 U. S. C. §§ 1343 (3) and (4).  The decision we announce today holds Alabama's substitute father regulation invalid as inconsistent with Subchapter IV of the Social Security Act.  We intimate no views as to whether and under what circumstances suits challenging state AFDC provisions only on the ground that they are inconsistent with the federal statute may be brought in federal courts.  See generally Note, Federal Judicial Review of State Welfare Practices, 67 Col. L. Rev. 84 (1967).

[4] We reject appellants' argument that appellees were required to exhaust their administrative remedies prior to bringing this action. Pursuant to the requirement of the Social Security Act that States must grant AFDC applicants who are denied aid "an opportunity for a fair hearing before the State agency," 42 U. S. C. § 602 (a) (4) (1964 ed., Supp. II), Alabama provides for administrative review of such denials.  Alabama Manual for Administration of Public Assistance, pt. I, § II, pp. V–5 to V–12.  Decisions of this Court, however, establish that a plaintiff in an action brought under the Civil Rights Act, 42 U. S. C. § 1983, 28 U. S. C. § 1343, is not required to exhaust administrative remedies, where the constitutional challenge is sufficiently substantial, as here, to require the convening of a three-judge court.  *Damico* v. *California,* 389 U. S. 416 (1967).  See also *McNeese* v. *Board of Education,* 373 U. S. 668 (1963); *Monroe* v. *Pape,* 365 U. S. 167, 180–183 (1961).  For a general discussion of review in the federal courts of state welfare practices, see Note, Federal Judicial Review of State Welfare Practices, 67 Col. L. Rev. 84 (1967).

[5] *Smith* v. *King,* 277 F. Supp. 31 (D. C. M. D. Ala. 1967).

U. S. 903 (1968), and, for reasons which will appear, we affirm without reaching the constitutional issue.

## I.

The AFDC program is one of three major categorical public assistance programs established by the Social Security Act of 1935. See U. S. Advisory Commission Report on Intergovernmental Relations, Statutory and Administrative Controls Associated with Federal Grants for Public Assistance 5–7 (1964) (hereafter cited as Advisory Commission Report). The category singled out for welfare assistance by AFDC is the "dependent child," who is defined in § 406 of the Act, 49 Stat. 629, as amended, 42 U. S. C. § 606 (a) (1964 ed., Supp. II), as an age-qualified [6] "needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with" any one of several listed relatives. Under this provision, and, insofar as relevant here, aid can be granted only if "a parent" of the needy child is continually absent from the home.[7] Alabama considers a man who qualifies as a "substitute father" under its regulation to be a nonabsent parent within the federal statute. The State therefore denies aid to an otherwise eligible needy child on the basis that his substitute parent is not absent from the home.

Under the Alabama regulation, an "able-bodied man,. married or single, is considered a substitute father of *all*

---

[6] A needy child, to qualify for the AFDC assistance, must be under the age of 18, or under the age of 21 and a student, as defined by HEW. 79 Stat. 422, 42 U. S. C. §§ 606 (a) (2) (A) and (B) (1964 ed., Supp. II).

[7] The States are also permitted to consider as dependent children needy children who have an unemployed parent, as is discussed in n. 13, *infra,* and needy children without a parent who have under certain circumstances been placed in foster homes or child care institutions. See 42 U. S. C. §§ 607, 608.

*the children of the applicant . . .* mother" in three different situations: (1) if "he lives in the home with the child's natural or adoptive mother for the purpose of cohabitation"; or (2) if "he visits [the home] frequently for the purpose of cohabiting with the child's natural or adoptive mother"; or (3) if "he does not frequent the home but cohabits with the child's natural or adoptive mother elsewhere."[8] Whether the substitute father is actually the father of the children is irrelevant. It is also irrelevant whether he is legally obligated to support the children, and whether he does in fact contribute to their support. What is determinative is simply whether he "cohabits" with the mother.[9]

The testimony below by officials responsible for the administration of Alabama's AFDC program establishes that "cohabitation," as used in the regulation, means essentially that the man and woman have "frequent" or "continuing" sexual relations. With regard to how frequent or continual these relations must be, the testimony is conflicting. One state official testified that the regulation applied only if the parties had sex at least once a week; another thought once every three months would suffice; and still another believed once every six months sufficient. The regulation itself provides that pregnancy or a baby under six months of age is prima facie evidence of a substitute father.

[8] Alabama Manual for Administration of Public Assistance, pt. I, c. II, § VI.

[9] Under the regulation, when "there appears to be a substitute father," the mother bears the burden of proving that she has discontinued her relationship with the man before her AFDC assistance will be resumed. The mother's claim of discontinuance must be "corroborated by at least two acceptable references in a position to know. Examples of acceptable references are: law-enforcement officials; ministers; neighbors; grocers." There is no hearing prior to the termination of aid, but an applicant denied aid may secure state administrative review.

Between June 1964, when Alabama's substitute father regulation became effective, and January 1967, the total number of AFDC recipients in the State declined by about 20,000 persons, and the number of children recipients by about 16,000, or 22%. As applied in this case, the regulation has caused the termination of all AFDC payments to the appellees, Mrs. Sylvester Smith and her four minor children.

Mrs. Smith and her four children, ages 14, 12, 11, and 9, reside in Dallas County, Alabama. For several years prior to October 1, 1966, they had received aid under the AFDC program. By notice dated October 11, 1966, they were removed from the list of persons eligible to receive such aid. This action was taken by the Dallas County welfare authorities pursuant to the substitute father regulation, on the ground that a Mr. Williams came to her home on weekends and had sexual relations with her.

Three of Mrs. Smith's children have not received parental support or care from a father since their natural father's death in 1955. The fourth child's father left home in 1963, and the child has not received the support or care of his father since then. All the children live in the home of their mother, and except for the substitute father regulation are eligible for aid. The family is not receiving any other type of public assistance, and has been living, since the termination of AFDC payments, on Mrs. Smith's salary of between $16 and $20 per week which she earns working from 3:30 a. m. to 12 noon as a cook and waitress.

Mr. Williams, the alleged "substitute father" of Mrs. Smith's children, has nine children of his own and lives with his wife and family, all of whom are dependent upon him for support. Mr. Williams is not the father of any of Mrs. Smith's children. He is not legally obligated, under Alabama law, to support any of Mrs. Smith's

children.[10]  Further, he is not willing or able to support
the Smith children, and does not in fact support them.
His wife is required to work to help support the Williams
household.

## II.

The AFDC program is based on a scheme of coopera-
tive federalism.  See generally Advisory Commission
Report, *supra,* at 1–59.  It is financed largely by the
Federal Government, on a matching fund basis, and is
administered by the States.  States are not required to
participate in the program, but those which desire to
take advantage of the substantial federal funds available
for distribution to needy children are required to submit
an AFDC plan for the approval of the Secretary of
Health, Education, and Welfare (HEW).  49 Stat. 627,

[10] Under Alabama statutes, a legal duty of support is imposed
only upon a "parent," who is defined as (1) a "natural legal parent,"
(2) one who has "legally acquired the custody of" the child, and
(3) "the father of such child, . . . though born out of lawful wedlock."
Ala. Code, Tit. 34, §§ 89, 90; Ala. Code, Tit. 27, §§ 12 (1), 12 (4)
(1965 Supp.).  *Law* v. *State,* 238 Ala. 428, 191 So. 803 (1939).  The
Alabama courts have interpreted the statute to impose a legal duty of
support upon one who has "publicly acknowledged or treated the child
as his own, in a manner to indicate his voluntary assumption of
parenthood" irrespective of whether the alleged parent is in fact the
child's real father.  *Law* v. *State,* 238 Ala. 428, 430, 191 So. 803, 805
(1939).  It seems clear, however, that even a stepfather who is not
the child's natural parent and has not acquired legal custody of him
is under an obligation of support only if he has made this "voluntary
assumption of parenthood."  See *Chandler* v. *Whatley,* 238 Ala. 206,
189 So. 751 (1939); *Englehardt* v. *Yung's Heirs,* 76 Ala. 534, 540
(1884); *Nicholas* v. *State,* 32 Ala. App. 574, 28 So. 2d 422 (1946).
Further, the Alabama Supreme Court has emphasized that the
alleged father's intention to support the child, requisite to a finding
of voluntary assumption of parenthood, "should not be slightly [*sic*]
nor hastily inferred . . . ."  *Englehardt* v. *Yung's Heirs,* 76 Ala. 534,
540 (1884).

42 U. S. C. §§ 601, 602, 603, and 604. See Advisory Commission Report, *supra,* at 21–23.[11] The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by HEW. 49 Stat. 627, as amended, 42 U. S. C. § 602 (1964 ed., Supp. II). See also HEW, Handbook of Public Assistance Administration, pt. IV, §§ 2200, 2300 (hereafter cited as Handbook).[12]

One of the statutory requirements is that "aid to families with dependent children . . . shall be furnished with reasonable promptness to all eligible individuals . . . ." 64 Stat. 550, as amended, 42 U. S. C. § 602 (a)(9) (1964 ed., Supp. II). As noted above, § 406 (a) of the Act defines a "dependent child" as one who has been deprived of "parental" support or care by reason of the death, continued absence, or incapacity of a "parent." 42 U. S. C. § 606 (a) (1964 ed., Supp. II). In combination, these two provisions of the Act clearly require participating States to furnish aid to families with children who have a parent absent from the home, if such families are in other respects eligible. See also Handbook, pt. IV, § 2200 (b)(4).

The State argues that its substitute father regulation simply defines who is a nonabsent "parent" under

[11] Alabama's substitute father regulation has been neither approved nor disapproved by HEW. There has, however, been considerable correspondence between the Alabama and federal authorities concerning the regulation, as is discussed in n. 23, *infra.*

[12] Unless HEW approves the plan, federal funds will not be made available for its implementation. 42 U. S. C. § 601. Further, HEW may entirely or partially terminate federal payments if "in the administration of the [state] plan there is a failure to comply substantially with any provision required by section 602 (a) of this title to be included in the plan." § 245, 81 Stat. 918, as amended, 42 U. S. C. § 604 (1964 ed., Supp. III). See generally Advisory Commission Report, *supra,* at 61–80.

§ 406 (a) of the Social Security Act. 42 U. S. C. § 606 (a) (1964 ed., Supp. II). The State submits that the regulation is a legitimate way of allocating its limited resources available for AFDC assistance, in that it reduces the caseload of its social workers and provides increased benefits to those still eligible for assistance. Two state interests are asserted in support of the allocation of AFDC assistance achieved by the regulation: first, it discourages illicit sexual relationships and illegitimate births; second, it puts families in which there is an informal "marital" relationship on a par with those in which there is an ordinary marital relationship, because families of the latter sort are not eligible for AFDC assistance.[13]

We think it well to note at the outset what is *not* involved in this case. There is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need [14] and to determine the level of benefits by the

---

[13] Commencing in 1961, federal matching funds have been made available under the AFDC subchapter of the Social Security Act for a State which grants assistance to needy children who have two able-bodied parents living in the home, but who have been "deprived of parental support or care by reason of the unemployment . . . of a parent." 42 U. S. C. § 607. Participation in this program for aid to dependent children of unemployed parents is not obligatory on the States, and the Court has been advised that only 21 States participate. Alabama does not participate.

[14] HEW's Handbook, in pt. IV, § 3120, provides that: "A needy individual . . . [under AFDC] is one who does not have income and resources sufficient to assure economic security, *the standard of which must be defined by each State.* The act recognizes that *the standard so defined depends upon the conditions existing in each State.*" (Emphasis added.) The legislative history of the Act also makes clear that the States have power to determine who is "needy" for purposes of AFDC. Thus the Reports of the House

amount of funds it devotes to the program.[15]  See Advisory Commission Report, *supra,* at 30–59.  Further, there is no question that regular and actual contributions to a needy child, including contributions from the kind of person Alabama calls a substitute father, can be taken into account in determining whether the child is needy.[16] In other words, if by reason of such a man's contribution,

---

Ways and Means Committee and Senate Finance Committee make clear that the States are free to impose eligibility requirements as to "means."  H. R. Rep. No. 615, 74th Cong., 1st Sess., 24 (1935); S. Rep. No. 628, 74th Cong., 1st Sess., 36 (1935).  The floor debates corroborate that this was Congress' intent.  For example, Representative Vinson explained that "need is to be determined under the State law."  79 Cong. Rec. 5471 (1935).

[15] The rather complicated formula for federal funding is contained in 42 U. S. C. § 603.  The level of benefits is within the State's discretion, but the Federal Government's contribution is a varying percentage of the total AFDC expenditures within each State.  See H. R. Rep. No. 615, 74th Cong., 1st Sess., 12, 24 (1935); S. Rep. No. 628, 74th Cong., 1st Sess., 4, 36 (1935).  The benefit levels vary greatly from State to State.  For example, for May 1967, the average payment to a family under AFDC was about $224 in New Jersey, $221 in New York, $39 in Mississippi, $20 in Puerto Rico, and $53 in Alabama.  Hearings on H. R. 12080 before the Senate Committee on Finance, 90th Cong., 1st Sess., pt. 1, 296–297 (1967). See generally Harvith, Federal Equal Protection and Welfare Assistance, 31 Albany L. Rev. 210, 226–227 (1967).

[16] Indeed, the Act requires that in determining need the state agency "shall . . . take into consideration any other income and resources of any child or relative claiming aid to families with dependent children . . . ."  42 U. S. C. § 602 (a) (7) (1964 ed., Supp. II). Regulations of HEW, which clearly comport with the statute, restrict the resources which are to be taken into account under § 602 to those "that are, in fact, available to an applicant or recipient for current use on a regular basis . . . ."  This regulation properly excludes from consideration resources which are merely assumed to be available to the needy individual.  Handbook, pt. IV, § 3131 (7).  See also §§ 3120, 3123, 3124, 3131 (10), and 3131 (11).

the child is not in financial need, the child would be ineligible for AFDC assistance without regard to the substitute father rule. The appellees here, however, meet Alabama's need requirements; their alleged substitute father makes no contribution to their support; and they have been denied assistance solely on the basis of the substitute father regulation. Further, the regulation itself is unrelated to need, because the actual financial situation of the family is irrelevant in determining the existence of a substitute father.

Also not involved in this case is the question of Alabama's general power to deal with conduct it regards as immoral and with the problem of illegitimacy. This appeal raises only the question whether the State may deal with these problems in the manner that it has hereby flatly denying AFDC assistance to otherwise eligible dependent children.

Alabama's argument based on its interests in discouraging immorality and illegitimacy would have been quite relevant at one time in the history of the AFDC program. However, subsequent developments clearly establish that these state interests are not presently legitimate justifications for AFDC disqualification. Insofar as this or any similar regulation is based on the State's asserted interest in discouraging illicit sexual behavior and illegitimacy, it plainly conflicts with federal law and policy.

A significant characteristic of public welfare programs during the last half of the 19th century in this country was their preference for the "worthy" poor. Some poor persons were thought worthy of public assistance, and others were thought unworthy because of their supposed incapacity for "moral regeneration." H. Leyendecker, Problems and Policy in Public Assistance 45–57 (1955); Wedemeyer & Moore, The American Welfare System, 54 Calif. L. Rev. 326, 327–328 (1966). This worthy-person concept characterized the mothers' pension wel-

fare programs,[17] which were the precursors of AFDC. See W. Bell, Aid to Dependent Children 3–19 (1965). Benefits under the mothers' pension programs, accordingly, were customarily restricted to widows who were considered morally fit. See Bell, *supra,* at 7; Leyendecker, *supra,* at 53.

In this social context it is not surprising that both the House and Senate Committee Reports on the Social Security Act of 1935 indicate that States participating in AFDC were free to impose eligibility requirements relating to the "moral character" of applicants. H. R. Rep. No. 615, 74th Cong., 1st Sess., 24 (1935); S. Rep. No. 628, 74th Cong., 1st Sess., 36 (1935). See also 79 Cong. Rec. 5679 (statement by Representative Jenkins) (1935). During the following years, many state AFDC plans included provisions making ineligible for assistance dependent children not living in "suitable homes." See Bell, *supra,* at 29–136 (1965). As applied, these suitable home provisions frequently disqualified children on the basis of the alleged immoral behavior of their mothers. *Ibid.*[18]

In the 1940's, suitable home provisions came under increasing attack. Critics argued, for example, that such disqualification provisions undermined a mother's confidence and authority, thereby promoting continued dependency; that they forced destitute mothers into increased immorality as a means of earning money; that they were habitually used to disguise systematic racial

---

[17] For a discussion of the mothers' pension welfare programs, see J. Brown, Public Relief 1929–1939, at 26–32 (1940).

[18] Bell quotes a case record, for example, where a mother whose conduct with men displeased a social worker was required, as a condition of continued assistance, to sign an affidavit stating that, "I . . . do hereby promise and agree that until such time as the following agreement is rescinded, I will not have any male callers coming to my home nor meeting me elsewhere under improper conditions." Bell, *supra,* at 48.

discrimination; and that they senselessly punished impoverished children on the basis of their mothers' behavior, while inconsistently permitting them to remain in the allegedly unsuitable homes. In 1945, the predecessor of HEW produced a state letter arguing against suitable home provisions and recommending their abolition. See Bell, *supra,* at 51. Although 15 States abolished their provisions during the following decade, numerous other States retained them. *Ibid.*

In the 1950's, matters became further complicated by pressures in numerous States to disqualify illegitimate children from AFDC assistance. Attempts were made in at least 18 States to enact laws excluding children on the basis of their own or their siblings' birth status. See Bell, *supra,* at 72–73. All but three attempts failed to pass the state legislatures, and two of the three successful bills were vetoed by the governors of the States involved. *Ibid.* In 1960, the federal agency strongly disapproved of illegitimacy disqualifications. See Bell, *supra,* at 73–74.

Nonetheless, in 1960, Louisiana enacted legislation requiring, as a condition precedent for AFDC eligibility, that the home of a dependent child be "suitable," and specifying that any home in which an illegitimate child had been born subsequent to the receipt of public assistance would be considered unsuitable. Louisiana Acts, No. 251 (1960). In the summer of 1960, approximately 23,000 children were dropped from Louisiana's AFDC rolls. Bell, *supra,* at 137. In disapproving this legislation, then Secretary of Health, Education, and Welfare Flemming issued what is now known as the Flemming Ruling, stating that as of July 1, 1961,

> "*A State plan . . . may not impose an eligibility condition that would deny assistance with respect to a needy child on the basis that the home conditions*

*in which the child lives are unsuitable, while the child continues to reside in the home.* Assistance will therefore be continued during the time efforts are being made either to improve the home conditions or to make arrangements for the child elsewhere." [19]

Congress quickly approved the Flemming Ruling, while extending until September 1, 1962, the time for state compliance. 75 Stat. 77, as amended 42 U. S. C. § 604 (b).[20] At the same time, Congress acted to implement the ruling by providing, on a temporary basis, that dependent children could receive AFDC assistance if they were placed in foster homes after a court determination that their former homes were, as the Senate Report stated, "unsuitable because of the immoral or negligent behavior of the parent." S. Rep. No. 165,

---

[19] State Letter No. 452, Bureau of Public Assistance, Social Security Administration, Department of Health, Education, and Welfare. (Emphasis added.)

[20] The Senate Finance Committee Report explained the purpose of the amendment as follows:

"The Department of Health, Education, and Welfare in January 1961 advised the State agencies administering title IV of the Social Security Act—aid to dependent children—that after June 30, 1961, grants to States would not be available if the State terminated assistance to children in a home determined to be unsuitable unless the State made other provision for the children affected. Section 4 of your committee's bill would provide that the requirement made by the Department of Health, Education, and Welfare would not become effective in States which took the type of action described, as the result of a State statute requiring such action, before the 61st day after the end of the regular session of such State's legislature, such regular session beginning following the enactment of this section. One or two of the States affected by the Department's ruling do not have regular sessions of their legislatures in 1961 and would accordingly be safeguarded against the withholding of funds until such time as their legislatures have had regular sessions and have had an opportunity to modify the State statutes involved." S. Rep. No. 165, 87th Cong., 1st Sess., 6 (1961).

87th Cong., 1st Sess., 6 (1961). See 75 Stat. 76, as amended, 42 U. S. C. § 608.[21]

In 1962, Congress made permanent the provision for AFDC assistance to children placed in foster homes and extended such coverage to include children placed in child-care institutions. 76 Stat. 180, 185, 193, 196, 207, 42 U. S. C. § 608. See S. Rep. No. 1589, 87th Cong., 2d Sess., 13 (1962). At the same time, Congress modified the Flemming Ruling by amending § 404 (b) of the Act. As amended, the statute permits States to disqualify from AFDC aid children who live in unsuitable homes, provided they are granted other "adequate care and assistance." 76 Stat. 189, 42 U. S. C. § 604 (b). See S. Rep. No. 1589, 87th Cong., 2d Sess., 14 (1962).

Thus, under the 1961 and 1962 amendments to the Social Security Act, the States are permitted to remove a child from a home that is judicially determined to be so unsuitable as to "be contrary to the welfare of such child." 42 U. S. C. § 608 (a)(1). The States are also permitted to terminate AFDC assistance to a child living in an unsuitable home, if they provide other adequate care and assistance for the child under a general welfare program. 42 U. S. C. § 604 (b). See S. Rep. No. 1589, 87th Cong., 2d Sess., 14 (1962). The statutory approval of the Flemming Ruling, however, precludes the States from otherwise denying AFDC assistance to dependent children on the basis of their mothers' alleged immorality or to discourage illegitimate births.

The most recent congressional amendments to the Social Security Act further corroborate that federal public welfare policy now rests on a basis considerably more

---

[21] For a discussion by then Secretary of HEW Ribicoff and now Secretary Cohen concerning the 1961 amendments in relation to the Flemming Ruling, see Hearings on H. R. 10032 before the House Committee on Ways and Means, 87th Cong., 2d Sess., 294–297, 305–307 (1962).

sophisticated and enlightened than the "worthy-person" concept of earlier times. State plans are now required to provide for a rehabilitative program of improving and correcting unsuitable homes, § 402 (a), as amended by § 201 (a)(1)(B), 81 Stat. 877, 42 U. S. C. § 602 (a)(14) (1964 ed., Supp. III); § 406, as amended by § 201 (f), 81 Stat. 880, 42 U. S. C. § 606 (1964 ed., Supp. III); to provide voluntary family planning services for the purpose of reducing illegitimate births, § 402 (a), as amended by § 201 (a)(1)(C), 81 Stat. 878, 42 U. S. C. § 602 (a) (15) (1964 ed., Supp. III); and to provide a program for establishing the paternity of illegitimate children and securing support for them, § 402 (a), as amended by § 201 (a)(1)(C), 81 Stat. 878, 42 U. S. C. § 602 (a)(17) (1964 ed., Supp. III).

In sum, Congress has determined that immorality and illegitimacy should be dealt with through rehabilitative measures rather than measures that punish dependent children, and that protection of such children is the paramount goal of AFDC.[22] In light of the Flemming

---

[22] The new emphasis on rehabilitative services began with the Kennedy Administration. President Kennedy, in his 1962 welfare message to the Congress, observed that communities that had attempted to cut down welfare expenditures through arbitrary cutbacks had met with little success, but that "communities which have tried the rehabilitative road—the road I have recommended today—have demonstrated what can be done with creative . . . programs of prevention and social rehabilitation." See Hearings on H. R. 10606 before the Senate Committee on Finance, 87th Cong., 2d Sess., 109 (1962). Some insight into the mood of the Congress that approved the Flemming Ruling in 1961 with respect to this matter is provided by an exchange during the debates on the floor of the House. Representative Gross inquired of Representative Mills, Chairman of the House Ways and Means Committee, concerning the AFDC status of illegitimate children. After a brief discussion in which Representative Mills explained that he was looking into the problem of illegitimacy, Representative Hoffman asked whether Representative Gross was taking the position that "these

Ruling and the 1961, 1962, and 1968 amendments to the Social Security Act, it is simply inconceivable, as HEW has recognized,[23] that Alabama is free to discourage immorality and illegitimacy by the device of absolute disqualification of needy children. Alabama may deal with these problems by several different methods under the

innocent children, no matter what the circumstances under which they were born, are to be deprived of the necessities of life." Representative Gross replied, "Oh, no; not at all," and agreed with Representative Hoffman's subsequent statement that the proper approach would be to attempt to prevent illegitimate births. 107 Cong. Rec. 3766 (1961). See generally Bell, *supra*, at 152–173.

[23] Both before and after the Flemming Ruling, the Alabama and federal authorities corresponded with considerable frequency concerning the State's suitable home and substitute father policies. In April 1959, HEW by letter stated that "suitable home" legislation then being proposed by Alabama raised substantial questions of conformity with the Social Security Act, because it seemed to deprive children of AFDC assistance on the basis of illegitimate births in the family. In May 1959 and again in August 1959 new suitable home policies were submitted and were rejected by HEW. Negotiations continued, and in June 1961, HEW responded that the newest legislative proposal was inconsistent with Congress' statutory approval of the Flemming Ruling because (1) assistance would be denied to children on the basis that their homes were unsuitable but they would be permitted to remain in the homes; and (2) a home could be found unsuitable simply on the basis of the child's birth status. Still later, on June 12, 1963, HEW rejected another Alabama suitable home provision on the ground that it provided for denial of AFDC assistance while the child remained in the home without providing for other "adequate care and assistance," as required by the 1962 amendment to the Federal Act. The evidence below establishes that soon after appellant King's appointment as Commissioner, he undertook a study that led to the adoption of the substitute father regulation. When this regulation was submitted to HEW, it responded that the regulation did not conform with 42 U. S. C. § 604 (b) for the same reasons as its predecessor legislative proposals. Additional correspondence ensued, but HEW never approved the regulation.

Social Security Act. But the method it has chosen plainly conflicts with the Act.

## III.

Alabama's second justification for its substitute father regulation is that "there is a public interest in a State not undertaking the payment of these funds to families who because of their living arrangements would be in the same situation as if the parents were married, except for the marriage." In other words, the State argues that since in Alabama the needy children of married couples are not eligible for AFDC aid so long as their father is in the home, it is only fair that children of a mother who cohabits with a man not her husband and not their father be treated similarly. The difficulty with this argument is that it fails to take account of the circumstance that children of fathers living in the home are in a very different position from children of mothers who cohabit with men not their fathers: the child's father has a legal duty to support him, while the unrelated substitute father, at least in Alabama, does not. We believe Congress intended the term "parent" in § 406 (a) of the Act, 42 U. S. C. § 606 (a), to include only those persons with a legal duty of support.

The Social Security Act of 1935 was part of a broad legislative program to counteract the depression. Congress was deeply concerned with the dire straits in which all needy children in the Nation then found themselves.[24] In agreement with the President's Committee on Eco-

---

[24] See H. R. Rep. No. 615, 74th Cong., 1st Sess., 9–10 (1935) (characterizing children as "the most tragic victims of the depression"); S. Rep. No. 628, 74th Cong., 1st Sess., 16–17 (1935) (declaring that the "heart of any program for social security must be the child").

nomic Security, the House Committee Report declared, "the core of any social plan must be the child." H. R. Rep. No. 615, 74th Cong., 1st Sess., 10 (1935). The AFDC program, however, was not designed to aid all needy children. The plight of most children was caused simply by the unemployment of their fathers. With respect to these children, Congress planned that "the work relief program and . . . the revival of private industry" would provide employment for their fathers. S. Rep. No. 628, 74th Cong., 1st Sess., 17 (1935). As the Senate Committee Report stated: "Many of the children included in relief families present no other problem than that of providing work for the breadwinner of the family." *Ibid.* Implicit in this statement is the assumption that children would in fact be supported by the family "breadwinner."

The AFDC program was designed to meet a need unmet by programs providing employment for breadwinners. It was designed to protect what the House Report characterized as "[o]ne clearly distinguishable group of children." H. R. Rep. No. 615, 74th Cong., 1st Sess., 10 (1935). This group was composed of children in families without a "breadwinner," "wage earner," or "father," as the repeated use of these terms throughout the Report of the President's Committee,[25] Committee Hearings[26] and Reports[27] and the floor debates[28] makes perfectly clear. To describe the sort of breadwinner that it had in mind, Congress employed the word

---

[25] See H. R. Doc. No. 81, 74th Cong., 1st Sess., 4–5, 29–30 (1935).

[26] Hearings on H. R. 4120 before the House Committee on Ways and Means, 74th Cong., 1st Sess., 158–161, 166, 174, 262–264 (1935); Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 102, 181, 337–338, 647, 654 (1935).

[27] See H. R. Rep. No. 615, 74th Cong., 1st Sess., 10 (1935); S. Rep. No. 628, 74th Cong., 1st Sess., 17–18 (1935).

[28] See 79 Cong. Rec. 5468, 5476, 5786, 5861 (1935).

"parent." 49 Stat. 629, as amended, 42 U. S. C. § 606 (a). A child would be eligible for assistance if his parent was deceased, incapacitated or continually absent.

The question for decision here is whether Congress could have intended that a man was to be regarded as a child's parent so as to deprive the child of AFDC eligibility despite the circumstances: (1) that the man did not in fact support the child; and (2) that he was not legally obligated to support the child. The State correctly observes that the fact that the man in question does not actually support the child cannot be determinative, because a natural father at home may fail actually to support his child but his presence will still render the child ineligible for assistance. On the question whether the man must be legally obligated to provide support before he can be regarded as the child's parent, the State has no such cogent answer. We think the answer is quite clear: Congress must have meant by the term "parent" an individual who owed to the child a state-imposed legal duty of support.

It is clear, as we have noted, that Congress expected "breadwinners" who secured employment would support their children. This congressional expectation is most reasonably explained on the basis that the kind of breadwinner Congress had in mind was one who was legally obligated to support his children. We think it beyond reason to believe that Congress would have considered that providing employment for the paramour of a deserted mother would benefit the mother's children whom he was not obligated to support.

By a parity of reasoning, we think that Congress must have intended that the children in such a situation remain eligible for AFDC assistance notwithstanding their mother's impropriety. AFDC was intended to provide economic security for children whom Congress could not reasonably expect would be provided for by simply secur-

ing employment for family breadwinners.[29] We think it apparent that neither Congress nor any reasonable person would believe that providing employment for some man who is under no legal duty to support a child would in any way provide meaningful economic security for that child.

A contrary view would require us to assume that Congress, at the same time that it intended to provide programs for the economic security and protection of *all* children, also intended arbitrarily to leave one class of destitute children entirely without meaningful protection. Children who are told, as Alabama has told these appellees, to look for their food to a man who is not in the least obliged to support them are without meaningful protection. Such an interpretation of congressional intent would be most unreasonable, and we decline to adopt it.

Our interpretation of the term "parent" in § 406 (a) is strongly supported by the way the term is used in other sections of the Act. Section 402 (a)(10) requires that, effective July 1, 1952, a state plan must:

> "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to families with dependent children in respect of a child who has been deserted or abandoned by a *parent*." 64 Stat. 550, 42 U. S. C. § 602 (a)(10). (Emphasis added.)

The "parent" whom this provision requires to be reported to law enforcement officials is surely the same "parent" whose desertion makes a child eligible for AFDC

---

[29] As the Senate Committee Report stated, AFDC was intended to provide for children who "will not be benefited through work programs or the revival of industry." S. Rep. No. 628, 74th Cong., 1st Sess., 17 (1935).

assistance in the first place. And Congress obviously did not intend that a so-called "parent" who has no legal duties of support be referred to law enforcement officials (as Alabama's own welfare regulations recognize),[30] for the very purpose of such referrals is to institute non-support proceedings. See Handbook, pt. IV, §§ 8100–8149.[31] Whatever doubt there might have been over this proposition has been completely dispelled by the 1968 amendments to the Social Security Act, which provide that the States must develop a program:

> "(i) in the case of a child born out of wedlock who is receiving aid to families with dependent children, to establish the *paternity of such child and secure support for him,* and
>
> "(ii) in the case of any child receiving such aid who has been deserted or abandoned *by his parent, to secure support for such child from such parent (or from any other person legally liable for such support)* . . . ." § 402 (a), as amended by § 201 (a) (1)(C), 81 Stat. 878, 42 U. S. C. § 602 (a)(17) (1964 ed., Supp. III). (Emphasis added.)

---

[30] Alabama's own welfare regulations state: "Report parents who ·are legally responsible under Alabama law. These are the *natural* or *adoptive* parents of a child. A natural parent includes the father of a child born out of wedlock, if paternity has been *legally* established. It does not apply to a stepparent." Alabama Manual for Administration of Public Assistance, pt. I, c. II, p. 36.

[31] HEW requires States to give notice of desertion only with respect to persons who, "under State laws, are defined as parents . . . for the support of minor children, and against whom legal action may be taken under such laws for desertion or abandonment." Handbook, pt. IV, § 8131 (2). And, as discussed in n. 10, *supra,* the alleged substitute father in the case at bar is not legally obligated by Alabama law to support the appellee children. See also Handbook, pt. IV, § 3412 (4) (providing that a stepparent not required by state law to support a child need not be considered the child's parent).

Another provision in the 1968 amendments requires the States, effective January 1, 1969, to report to HEW any *"parent . . . against whom an order for the support and maintenance* of such [dependent] child or children has been issued by" a court, if such parent is not making the required support payments. § 402 (a), as amended by § 211 (a), 81 Stat. 896, 42 U. S. C. § 602 (a)(21) (1964 ed., Supp. III). (Emphasis added.) Still another amendment requires the States to cooperate with HEW in locating any *parent* against whom a support petition has been filed in another State, and in securing compliance with any support order issued by another State, § 402 (a), as amended by § 211 (a), 81 Stat. 897, 42 U. S. C. § 602 (a)(22) (1964 ed., Supp. III).

The pattern of this legislation could not be clearer. Every effort is to be made to locate and secure support payments from persons legally obligated to support a deserted child.[32] The underlying policy and consistency in statutory interpretation dictate that the "parent" referred to in these statutory provisions is the same parent as that in § 406 (a). The provisions seek to secure parental support in lieu of AFDC support for dependent children. Such parental support can be secured only where the parent is under a state-imposed legal duty to support the child. Children with alleged substitute parents who owe them no duty of support are entirely unprotected by these provisions. We think that these provisions corroborate the intent of Congress that the only kind of "parent," under § 406 (a), whose presence in the home would provide adequate economic protection for a dependent child is one who is legally obligated to support him. Consequently, if Alabama believes it

---

[32] Another 1968 amendment provides for the cooperation of the Internal Revenue Service in locating missing "parents." § 410, 81 Stat. 897.

necessary that it be able to disqualify a child on the basis of a man who is not under such a duty of support, its arguments should be addressed to Congress and not this Court.[33]

## IV.

Alabama's substitute father regulation, as written and as applied in this case, requires the disqualification of otherwise eligible dependent children if their mother "cohabits" with a man who is not obligated by Alabama law to support the children. The regulation is therefore invalid because it defines "parent" in a manner that is inconsistent with § 406 (a) of the Social Security Act. 42 U. S. C. § 606 (a).[34] In denying AFDC assistance to appellees on the basis of this invalid regulation, Alabama has breached its federally imposed obligation to furnish "aid to families with dependent children . . . with reasonable promptness to all eligible individuals . . . ." 42 U. S. C. § 602 (a)(9) (1964 ed., Supp. II). Our conclusion makes unnecessary consideration of appellees' equal-protection claim, upon which we intimate no views.

We think it well, in concluding, to emphasize that no legitimate interest of the State of Alabama is defeated

---

[33] We intimate no views whatsoever on the constitutionality of any such hypothetical legislative proposal.

[34] There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid. See *Ivanhoe Irrigation District* v. *McCracken*, 357 U. S. 275, 295 (1958); *Oklahoma* v. *Civil Service Comm'n*, 330 U. S. 127, 143 (1947). It is equally clear that to the extent HEW has approved any so-called "man-in-the-house" provision which conflicts with § 406 (a) of the Social Security Act, 42 U. S. C. § 606 (a), such approval is inconsistent with the controlling federal statute.

by the decision we announce today. The State's interest in discouraging illicit sexual behavior and illegitimacy may be protected by other means, subject to constitutional limitations, including state participation in AFDC rehabilitative programs. Its interest in economically allocating its limited AFDC resources may be protected by its undisputed power to set the level of benefits and the standard of need, and by its taking into account in determining whether a child is needy all actual and regular contributions to his support.

All responsible governmental agencies in the Nation today recognize the enormity and pervasiveness of social ills caused by poverty. The causes of and cures for poverty are currently the subject of much debate. We hold today only that Congress has made at least this one determination: that destitute children who are legally fatherless cannot be flatly denied federally funded assistance on the transparent fiction that they have a substitute father.

*Affirmed.*

MR. JUSTICE DOUGLAS, concurring.

The Court follows the statutory route in reaching the result that I reach on constitutional grounds. It is, of course, traditional that our disposition of cases should, if possible, be on statutory rather than constitutional grounds, unless problems of statutory construction are insurmountable. *E. g., Harmon v. Brucker,* 355 U. S. 579, 581.

We do have, however, in this case a long-standing administrative construction that approves state AFDC plans containing a man-in-the-house provision.[1] Certainly that early administrative construction, which so far as I can ascertain has been a consistent one, is entitled

---

[1] See the Appendix to this opinion.

to great weight. *E. g., Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408.

The Department of Health, Education, and Welfare balked at the Alabama provision only because it reached all nonmarital sexual relations of the mother, not just nonmarital relations on a regular basis in the mother's house.[2] Since I cannot distinguish between the two categories, I reach the constitutional question.[3]

The Alabama regulation describes three situations in which needy children, otherwise eligible for relief, are to be denied financial assistance. In none of these is the child to blame. The disqualification of the family, and hence the needy child, turns upon the "sin" of the mother.[4]

First, if a man not married to the mother and not the father of the children lives in her home for purposes of cohabiting with her, the children are cast into the outer darkness.

Second, if a man who is not married to the mother and is not the father of the children visits her home for the

---

[2] See discussion by the District Court in this case, *Smith* v. *King,* 277 F. Supp. 31, 36–38.

[3] Moreover, the Court's decision based on statutory construction does not completely resolve the question presented. The District Court, having found a violation of the Fourteenth Amendment, issued an unconditional injunction. Under the Court's opinion, however, Alabama is free to revive enforcement of its substitute parent regulation at any time it chooses to reject federal funds made available under the Social Security Act.

[4] Whether the mother alone could constitutionally be cut off from assistance because of her "sin" (compare *Glona* v. *American Insurance Co.,* 391 U. S. 73) is a question not presented. The aid is to the needy family, and without removing the children from their mother because of her unfitness—action not contemplated here, as far as the record indicates—there is no existing means by which Alabama can assist the children while ensuring that the mother does not benefit.

purpose of cohabiting with her, the needy children meet the same fate.

Third, if a man not married to the mother and not the father of the children cohabits with her outside the home, then the needy children are likewise denied relief. In each of these three situations the needy family is wholly cut off from AFDC assistance without considering whether the mother's paramour is in fact aiding the family, is financially able to do so, or is legally required to do so. Since there is "sin," the paramour's wealth or indigency is irrelevant.

In other words, the Alabama regulation is aimed at punishing mothers who have nonmarital sexual relations. The economic need of the children, their age, their other means of support, are all irrelevant. The standard is the so-called immorality of the mother.[5]

The other day in a comparable situation we held that the Equal Protection Clause of the Fourteenth Amendment barred discrimination against illegitimate children. We held that they cannot be denied a cause of action because they were conceived in "sin," that the making of such a disqualification was an invidious discrimination. *Levy* v. *Louisiana,* 391 U. S. 68. I would think precisely the same result should be reached here. I would say that the immorality of the mother has no rational connection with the need of her children under any welfare program.

I would affirm this judgment for the reasons more fully elaborated in the opinion of the three-judge District Court. *Smith* v. *King,* 277 F. Supp. 31, 38–40.

---

[5] This penalizing the children for the sins of their mother is reminiscent of the archaic corruption of the blood, a form of bill of attainder, which I have discussed recently in a different context. *George Campbell Painting Corp.* v. *Reid, ante,* p. 289 (dissenting opinion).

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS, CONCURRING.

States which, according to HEW, currently have "man-in-the-house" policies in their plans for the Federal-State program of Aid to Families with Dependent Children.

| *State and effective date of approved state policy.* | *Status of subsequent revisions submitted for approval and incorporation in the State's plan.* |
| --- | --- |
| Alabama........ Dec. 1962 | Revision dated July 1964 and all subsequent revisions including an Administrative Letter of Nov. 13, 1967, are being held pending approval. |
| Arizona........ Nov. 1963 | Latest revision incorporated May 24, 1967. |
| Arkansas....... Aug. 1959 | |
| District of Columbia. Jan. 1955 | A revision dated Dec. 27, 1960, was incorporated into the approved plan on Jan. 13, 1961; however, when the District's plan manual was revised and resubmitted as the State's plan, in June 1964, the "man-in-the-house" provisions were not accepted and together with subsequent revisions are still pending approval. |
| Florida......... July 1959 | |
| Georgia........ April 1952 | |
| Indiana ................. | A "man-in-the-house" provision, not previously in the State's plan, was submitted in Sept. 1964, to be effective Aug. 1964, and is still being held pending approval. |
| Kentucky....... June 1962 | Revised state plan pages including these provisions were approved for incorporation in 1964 and 1965. |
| Louisiana..... Jan. 1, 1961 | Revisions submitted in 1962 and 1964 are still being held pending approval. |
| Michigan....... July 1955 | Revisions dated Apr. 2, 1963, were approved June 4, 1963. |

338

| State and effective date of approved state policy. | Status of subsequent revisions submitted for approval and incorporation in the State's plan. |
|---|---|
| Mississippi...... Feb. 1954 | Revisions submitted in 1966 and subsequently are being held pending approval. |
| Missouri........ Oct. 1951 | |
| New Hampshire...... 1948 | |
| New Mexico.... April 1964 | A revised state plan page including this provision was approved for incorporation June 16, 1967. |
| North Carolina.. Sept. 1955 | |
| Oklahoma...... May 1963 | A revised state plan page including this provision was approved for incorporation Mar. 1964 and a correction of a clerical error which would have changed the sense of the provision was made and accepted Feb. 1967. |
| South Carolina.. Oct. 1956 | |
| Tennessee....... June 1955 | Three revisions, beginning in 1964, are being held pending approval. |
| Texas.......... Nov. 1959 | |
| Virginia......... July 1956 | A revision dated July 1962 is still being held pending approval. |