113 N.J. Super. 99 (1971)
272 A.2d 768
JOYCE BUCHANAN, JESSIE RAMSEUR, NANCY FULLER, ELIZABETH WILLIAMS, VIVIAN SIMMONS, BEATRICE GREEN, ETHEL BANKS AND MARION KIDD, ALL INDIVIDUALLY, ON BEHALF OF THEIR MINOR CHILDREN, AND ON BEHALF AF ALL SIMILARLY SITUATED PERSONS, PLAINTIFFS,
v.
ESSEX COUNTY WELFARE BOARD AND PHILIP K. LAZARO, DIRECTOR OF THE ESSEX COUNTY WELFARE DEPARTMENT, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 15, 1971.
*100 Mr. Michael C. Parks, of the Newark-Essex Joint Law Reform Project, for plaintiffs.
Mr. Ronald Reichstein for defendants.
ANTELL, J.S.C. (temporarily assigned).
Defendant Essex County Welfare Board is a county agency charged with the responsibility for administering financial assistance and other services to needy dependent children and the parent or relative with whom they are living, under the federally-funded Aid to Families With Dependent Children program, hereinafter called AFDC. N.J.S.A. 44:10-2. Plaintiffs are recipients of welfare benefits under AFDC and sue as a class for declaratory judgment and injunctive relief to determine when, within a given payment period, the full amount of financial assistance to which they are admittedly entitled from defendant must be paid.
The members of plaintiffs' class also occupy the status of obligees under judicial support orders entered against legally responsible relatives  most often deserting fathers  based upon nonsupport complaints which defendant instructs *101 plaintiffs to file in the Juvenile and Domestic Relations Court by reason of the relative's failure to meet his support obligations. Payments thereunder are required to be made either directly to the recipient-obligee by the responsible relative or through the probation department. In either case it is defendant's practice to deduct the amount of the court-ordered obligation from the welfare recipient's entitlements when these are paid at the beginning of each monthly payment period and to reimburse the recipient by the issuance of a supplemental assistance check if the support payment or any part thereof is later shown by the recipient to have been in default.
In this process the length of time between the start of a payment period until the fact of a reportable support order delinquency is perceived varies from case to case. How much anxiety is required to impel a particular welfare client to investigate what has happened to an overdue payment and the point in time at which economic deprivation becomes acute are often governing factors. Additional delays follow in attempts to report the delinquency either by telephone or personal visits to burdened case workers, who are not always available and whose efforts to return such calls are frustrated by the recipient's lack of telephone service. After the report is received, time-consuming verifying procedures are followed by the agency which must be completed before payment is authorized. The cumulative effect thereof is that three to four weeks can sometimes pass before the needed supplemental assistance check is issued.
The practice hereinabove related is departed from, however, where the support obligor is "habitually" delinquent. In this case the recipient is placed on what is called a "full payment process," is paid the full grant at the beginning of each payment period, and defendant applies to the court to be substituted as obligee under the support order. Under standards formulated by defendant, delinquencies are deemed "habitual" where: (1) payments have been delinquent in whole or substantial part for three consecutive months, or *102 (2) payments have been delinquent in whole or substantial part in eight of the preceding 12 months, or (3) supplemental assistance checks have been issued by reason of substantial delinquencies for four of the preceding six months.
Plaintiffs maintain that they are entitled to the full amount of their welfare grant at the beginning of each month without deduction for the amounts ordered paid for their support by legally responsible relatives. Defendant responds that its practice of withholding such moneys is in all respects lawful and not inconsistent with local and congressional intent as expressed in state and federal legislation and administrative regulations promulgated thereunder. This is the controversy.
It is first noted that defendant has expressly disavowed any defense to the action based upon plaintiffs' failure to exhaust administrative remedies.
AFDC is one of three major categorical public assistance programs established by the Social Security Act of 1935. The class thereby selected for welfare assistance is the "dependent child," who is defined in 42 U.S.A. § 606(a) as a
* * * needy child (1) who has been deprived of parental support or care by reason of death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or neice, in a place of residence maintained by one or more of such relatives as his or their own home.
There are also specified age qualifications.
The program
* * * is financed largely by the Federal Government, on a matching fund basis, and is administered by the States. States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education, and Welfare (HEW). [King v. Smith, 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968)]
*103 It is "based on a scheme of cooperative federalism." Id., 88 S.Ct. 2133.
The state plan must conform with numerous requirements and conditions prescribed by the federal legislation and with rules and regulations promulgated by the Secretary of Health, Education and Welfare. 42 U.S.C. § 602. King v. Smith, supra, 88 S.Ct. at 2133; Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970). One such requirement is that "aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 602(a) (10). Accordingly, the New Jersey legislation expressly provides that "assistance shall be furnished with reasonable promptness to or for all eligible individuals." N.J.S.A. 44:10-3(b). The benefits are received as a matter of statutory entitlement for persons qualified to receive them and not simply as a matter of benevolence.
From its founding the Nation's basic commitment has been to foster the dignity and well-being of all persons within its borders. We have come to recognize that forces not within the control of the poor contribute to their poverty. This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity. Public assistance, then, is not mere charity, but a means to "promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." The same governmental interests which counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it; pre-termination evidentiary hearings are indispensable to that end. [Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970)]
The utilitarian basis of this legislation is illuminated in Sen. Rep. No. 628, 74th Cong., 1st Sess., 16-17 (1935), as noted in the dissenting opinion of Justice Douglas in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970):
*104 With no income coming in, and with young children for whom provision must be made for a number of years, families without a father's support require public assistance, unless they have been left with adequate means or are aided by friends and relatives. * * * Through cash grants adjusted to the needs of the family it is possible to keep the young children with their mother in their own home, thus preventing the necessity of placing the children in institutions. This is recognized by everyone to be the least expensive and altogether the most desirable method for meeting the needs of these families that has yet been devised. [at 1167]
The federal enactments permit each state to determine its own standard of need as a condition for eligibility under the program. King v. Smith, supra, 88 S.Ct. at 2134. New Jersey, by administrative regulations promulgated under N.J.S.A. 44:10-1(c)(3), has established as its standard for "an adequate minimum level of living * * * a money amount which is sufficient to finance the purchase of those goods and services which are essential for physical health and safety." Categorical Assistance Budget Manual § 102. Hence, the defined condition of eligibility is that the applicant be "destitute, without funds or assets." E.g., Goldberg v. Kelly, supra, 90 S.Ct. at 1017.
Assuming, as we must, that defendant faithfully meets its obligation to preserve this boundary inviolate, we can see how perilous the recipient's very existence becomes  particularly in a rapidly rising economy  where there is any interruption or reduction in the financial assistance needed to buy only that amount of food, clothing, shelter and services vital to the maintenance of life itself. Nevertheless, the overriding objectives of assistance remain as expressed in N.J.S.A. 44:10-1(a):
(1) To provide for the care of needy dependent children in their own homes or in the homes of relatives, under standards and conditions compatible with decency and health.
(2) To help maintain and strengthen family life, and
(3) To help such parents or relatives to attain the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection.
*105 The administration of this huge program has resulted in a proliferation of statutes, regulations and directives on the federal, state and local levels. In the main, the federal rules and regulations are published in the Federal Handbook of Public Assistance Administration (hereinafter referred to as Federal Handbook). 42 U.S.C. § 1302. The state regulations issued pursuant to N.J.S.A. 44:10-3 are contained in the Categorical Assistance Budget Manual (hereinafter referred to as Budget Manual) prepared by the Division of Public Welfare of the Department of Institutions and Agencies, and the Manual of Administration prepared by the Bureau of Assistance of the Department of Institutions and Agencies.
Among other uses, the Budget Manual is employed by defendant's case worker to determine the amount of benefits to be paid the applicant, and in this connection furnishes guidelines to the case worker as to which of the applicant's resources should be taken into consideration in determining the extent of need and assistance required. This is required by federal law. 42 U.S.C. § 602(a) (7). Budget Manual § 402.61 states that consideration be given to resources to be derived by the applicant from relatives and friends. However, § 501.3 directs that "only the amount of support * * * actually being received by the client shall be considered as an available resource." (Emphasis added). §§ 501.1 and 501.2 impose upon defendant agency the duty of determining the willingness of the relatives to contribute to the support of the client and the extent of contributions which are available. Such contributions are considered only a "potential" resource where the relative fails to make contributions deemed to be within his capacity. Budget Manual § 501.4. Only the amount actually being received by the welfare client may be considered as an "available" resource. Budget Manual § 501.3. Federal Handbook § 3120 directs that:
* * * a state must differentiate between resources that can be counted on because they are available for current use on a regular basis and those found not to be available for the individual's use in *106 meeting subsistence needs as defined in the State's standard. This means taking into consideration, in determining need and amount of payment, all current income from all resources such as earnings, OASDI monthly benefits, contributions, etc., actually available to meet the individual's needs on a regular basis * * * and in contrast, omitting from consideration in determining need and amount of payment any income or resources merely assumed to be possessed by the individual.
Thus, income must not be considered where it is not, in fact, currently available to the needy individual; e.g., support payments ordered by the court but which are not, in fact, made; contributions which relatives have been determined able to make but which are not, in fact, made; * * *.
For cases in which income or resources are initially available but are then discontinued, e.g., cases in which a payment under a court order, or contributions, continue for several months and then cease, assistance payments will need to be adjusted promptly to reflect this change in circumstances. [Emphasis added]
Federal Handbook § 3124 further emphasizes the character of the defendant's obligation in the following language:
Court-ordered support payments by absent parents must be taken into account when they are in fact available to the family, but with provisions that insure that income is available to meet the needs of the mother and children on a regular monthly basis. In reviewing actual practice, it has been found that most support payments in AFDC are irregular. For families whose incomes are limited, an interruption or fluctuation in support payments can result in severe hardship to the family.
Reduced assistance payments based on assumed receipt of support payments or any other income that is not, in fact, available, are inconsistent with the welfare agency's responsibility for meeting need and strengthening family life. They result in inequity in meeting the continuing needs of the families affected [Emphasis added]
And Federal Handbook § 3131.11 provides:
Effective July 1, 1967, the State Plan must assure that, when support payments by absent parents have been ordered by a court, a regular amount of income is available monthly to meet the determined needs of the mother and children whether or not the support payments are received regularly, and that the agency will not delay or reduce public assistance payments on the basis of assumed support which is not actually available. [Emphasis added]
*107 § 2320.1 of the New Jersey Manual of Administration referring to court-ordered payments from legally responsible relatives, also directs that:
Assistance payments in the amount actually required by the client according to public assistance standards shall not be delayed or reduced merely on the basis of assumed support which is not actually available.
Problems arising from the concept of "assumed income" in connection with the computation of assistance moneys needed to meet the "essentials of living" have more than once caught the attention of the Director of the New Jersey Division of Public Welfare. On June 1, 1967, for example, he distributed Circular Letter No. 325 to all county welfare directors reminding them of the requirements of Federal Handbook § 3120, supra, and admonishing them in underscored language that
* * * income must not be considered where it is not, in fact, currently available to the needy individual, e.g., support payments ordered by the court but which are not, in fact, made; contributions which relatives have been determined able to make but which are not, in fact, made; * * *.
The Director's unmistakable meaning seems not to have been uniformly heeded since on May 26, 1970, by Circular Letter No. 800, he called the attention of the county welfare directors to incidents where the rule precluding the assumption of income not actually available was not being observed and redirecting their attention to his previous letter. Defendant's policies nevertheless remain unchanged.
Defendant resists plaintiff's application for relief on two grounds. The first is $2320.2 (b) of the Manual of Administration. This provides:
A report that the relative has failed to comply with the Court Order shall be investigated by the county welfare board without delay. If substantiated, the following policy and procedures shall be observed.

* * * * * * * *
*108 When there is evidence that a relative is habitually making irregular payments, or payments in amounts less than ordered, the county welfare board shall:
1) As of the first day of the next regular payment period adjust the grant to correct any current deficit by the irregular or insufficient payment of the Order; and
2) Immediately offer the client the opportunity to have the regular continuing grant adjusted to provide the full amount of assistance (to which the client is entitled without regard to the Order of Support) under an arrangement whereby any support payments thereafter, if received directly by the client, will be forwarded to the county welfare board, or, if paid through the Probation Department, will be handled as follows: * * *.
It was in conformity with this regulation that defendant's tri-level test of habitually delinquent payments was formulated, a standard which it urges is companionable both with the statutory mandate that payments be made with "reasonable promptness" and with fulfilling the agency's obligation to take into account all resources actually available to the recipient in determining the extent of assistance required.
But this regulation does no more than set out the minimum obligation imposed upon defendant where support payments are habitually irregular. It furnishes no guidance as to when payments become "habitually irregular." The answer to this question can only be found in the overall statutory policy of paying benefits "promptly" and with a minimum of hardship to the recipient.
Secondly, defendant refers to § 2954.3(a) of the Manual of Administration which provides:
There are three possible general methods for the handling of court-ordered support payments: (1) There is the arrangement whereby payment of support is made directly to the dependent person; (2) There is the arrangement whereby payment is ordered to be made to the Probation Office and then remitted by that office to the client. (3) The method which will most effectively assure the client regular and uninterrupted payments, in the amount necessary to meet full budgeted requirements, is the procedure whereby support payments, through court authorization, are made to the Probation Department which in turn makes the payment over to the county welfare board, with the county welfare board continuing to meet the full need of the client through the assistance grant.
*109 Defendant argues that the import of method (3) therein contained is that without court authorization for the substitution of defendant as the obligee under the order for support payments to be made through the probation department, defendant is precluded from paying the full amount of the assistance grant to the recipient. Since, as the argument continues, the Essex County Juvenile and Domestic Relations Court has not in the past substituted defendant as beneficiary of support orders (for reasons never made clear by defendant) in a sufficient number of cases, defendant cannot pay full benefits as a matter of policy. That this claimed impediment to paying the full grant does not hamper such payments where the absent father's delinquencies come under its rule-of-thumb standard of being "habitual" does not seem to offend defendant's sense of consistency. Apart therefrom, the cited regulation does nothing more than point out a procedure whereby support payments may be collected by defendant when the recipient is placed on a full payment process. It does not suggest the procedure is a necessary condition to being placed on such a process.
Defendant does not defend its practice in terms of any legitimate governmental purpose being thereby advanced. It does not argue greater administrative efficiency or cost curtailment. In fact, the relief asked by plaintiffs would probably result in greater efficiency and cost reduction by eliminating the investigative and administrative procedures involved in the issuance of supplemental assistance checks. It almost appears that we are asked to favor the idle preferences of a somnolent bureaucracy over "the most basic economic needs of impoverished human beings." Dandridge v. Williams, 90 S.Ct. 1153, 1162 (1970).
The class for which relief is sought to this action is composed almost entirely of deserted children and their mothers. They are indigent  without material possessions beyond those necessary for minimum subsistence. Their only conceivable resource lies in the support orders entered against the absent fathers who have proven irregular in *110 making payments. Living under these oppressive conditions the mothers turn for needed financial assistance to AFDC in their efforts to hold their family together and provide for the children some degree of parental care and protection. The benefits to which they are entitled as a matter of statutory right are provided for under a program sponsored by enlightened and humanitarian principles of concern for the poor and which responds to great challenges beyond merely alleviating the most ordinary symptoms of poverty: hunger, shame, sickness, the cold. In their enunciations of policy our congressional and state lawmakers did not limit themselves to the preservation of life itself. Our source statute speaks of "decency and health," "family life," "self-support and personal independence." Their object was to liberate the mother from her economic burden so that she may function as a parent. See Friedlander, Introduction to Social Welfare 278 (3d ed. 1968), noting a study by the American Public Welfare Association upon the role of AFDC in preserving the family structure and reducing the incidence of child neglect under conditions of want.
The implementing state and federal regulations are animated almost exclusively by a purpose to soften for the children the painful reality of being poor and abandoned. Their clear mandate is that they be provided benefits without hardship to them and with the burden of all administrative problems being borne by the welfare agency. Although the agency is required by state and federal law to determine the full extent of support moneys available to the client, the duty of ascertaining the willingness of relatives to contribute to the client's support, the extent of their ability to do this, and the amount being currently contributed is placed upon the agency, not the client. The regulations furnish explicit guidance as to when support orders may be taken into account as a resource to the client, and it is clear that may not be considered as such so as to allow the interruption or reduction of assistance except when payments thereunder are currently made; i.e., they must be a real, and not a fancied resource. *111 And they pointedly direct that when support payments are initially made and then discontinued, assistance payments must be "adjusted promptly."
In every relevant particular defendant's practice which we are called upon to examine contravenes governing policies. By forcing the recipients to go month after month, waiting for support payments which may never arrive, and to make frantic applications for supplemental assistance as the household funds dwindle to the last dollar, obviously produces budget problems and emotional tensions of acute severity. The element of stress which it introduces into already sorely tested households is pernicious and certainly incompatible with the maintenance of a sound family unit. The practice also violates the regulatory requirement that defendant, not the recipient, bear the burden of investigating the absent relative's willingness to make payments. Furthermore, the practice is persisted in the face of regulatory requirements that the ordered support payments not be deducted from entitlements unless they are actually currently available, an irregularity which has twice been called to defendant's attention by the State Director of Public Welfare himself.
Considerations of logic, announced social policy and raw human need overwhelmingly favor the plaintiffs' demand for relief. The frequency with which benefits are interrupted, and the consequent hardship resulting therefrom, by reason of defendant's determination not to pay full benefits until support-ordered payments have become habitually delinquent by the standards which it applies, cannot be countenanced under state and federal law.
While the court recognizes that a court order for the payment of support is some evidence of an available resource to a recipient, the necessity for its existence also evidences the unreliability of the absent relative to whom it is directed and the undependability of regular payments. It would seem that the nonavailability of such payments as an actual resource is satisfactorily established upon the occurrence of a single default thereunder during any one payment period. *112 Balancing all considerations, therefore, it is concluded that the dual policy of making payment with "reasonable promptness" and ascertaining whether support payments required by court order are an actually available resource can be served solely by requiring defendant to give recipients the opportunity to be placed on a full-payment process when support-ordered payments become delinquent in any one payment period.
The court has been materially assisted by able research and briefing by counsel for plaintiffs.