Nancy **REMILLARD**, etc., et al.,
Plaintiffs,

v.

Robert B. **CARLESON** et al., Defendants.
No. C–70 2273 ACW.

United States District Court,
N. D. California.

March 31, 1971.

Eugene M. Swann, and Carmen L. Massey, Richmond, Cal., for Contra Costa Legal Services Foundation, for plaintiffs.

Evelle J. Younger, Atty. Gen. of California, with Jay S. Linderman, Deputy Atty. Gen., San Francisco, Cal., for defendants.

Before HAMLIN, Circuit Judge; CONTI and WOLLENBERG, District Judges.

### ORDER GRANTING DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

PER CURIAM.

California participates in the federal aid to needy families program. 42 U.S.C. § 601 *et seq.* Part of this program gives aid to needy children who are "deprived of parental support or care by reason of the * * * continued absence from the home * * * of a parent".

Plaintiffs are mothers whose husbands are absent from home while on duty with the armed forces of the United States. Plaintiffs receive monthly allotment checks from the military, but such checks seldom if ever total more than $150.00 per month.[1] The State does not contest that both plaintiffs, as well as many other military dependents, could easily demonstrate the "need" required by the statute cited above. The State does claim, however, that absence occasioned by a father's military duties can never be "continued" within the meaning of 42 U.S.C. § 601. California Depart-

---

1. Plaintiff Joyce Dones, with two young children, and a baby soon to be born, receives $145.00 as her allotment from the Army. Prior to his induction, Mr. Dones earned approximately $600.00 per month in civilian employment. Plaintiff Nancy Remillard is the mother of one child. Her husband is an enlistee now serving in Vietnam; her allotment totals $130.60, which sum has often been delayed for considerable periods due to bureaucratic errors.

ment of Social Welfare Regulation EAS section 42–350.1.[2]

Plaintiffs challenge this state-wide regulation on both statutory and constitutional grounds, and ask that the Court enjoin its enforcement. A three-judge court was appointed. See King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (note 3), and Gilmore v. Lynch, 400 F.2d 228 (9 Cir. 1969). Memoranda were submitted, and by agreement of both parties, hearings on plaintiffs' motions for preliminary and final relief, as well as on defendants' motion for summary judgment, were consolidated. Said hearing being held, the matter was taken under submission.

The Federal Act mandates that aid be given "with reasonable promptness to all eligible individuals". 42 U.S.C. § 602(a) (10). An eligible child, within the present context, is one whose parent is absent from the home on a "continued" basis, which absence deprives the child of support and care. The precise definition of "continued absence" rests with the States, but regulations of the Department of Health, Education and Welfare provide specific guidelines for this decision:

> "Within this interpretation of continued absence *the State* agency in developing its policy *will find it necessary to give consideration* to such situations as divorce, pending divorce, desertion, informal or legal separation, hospitalization for medical or psychiatric care, search for employment, employment away from home, *service in the armed forces or other military service*, and imprisonment." HEW, Handbook of Public Assistance Administration § 3422.2 (emphasis added).

The key to the instant dispute is the phrase "will * * * give consideration to * * *." In cases of a father's absence due to imprisonment, or temporary medical treatment, or parental separation, California considers each applicant's situation individually. There is no across-the-board exclusion of any of these categories listed in the HEW regulation.[3] But children of fathers absent on military orders get a different kind of "consideration". California claims that it has judged this group, *as a group*, and has decided it is to be deemed ineligible for § 606 payments.

This blanket exclusion of an entire group, specifically designated in the regulation as worthy of consideration, is reminiscent of California's one-time practice of conclusively presuming that informal parental separations did not result in "continued" absence until three months had passed. A three judge court of this circuit refused to find this all-encompassing declaration of ineligibility consistent with the policies behind § 606. The latter is designed for the sustenance of needy children. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). The Court found that it might have been administratively convenient to "give consideration" to an entire group and thereby totally exclude it. But the three judges found that such a device wrongly denied aid to many children who, if given individual consideration, would have been able to show a disruption of family support patterns every bit as grave as that caused in situations where the family breadwinner has been imprisoned or deported, and where § 606 payments are given. Damico v. California, No. 46538 (N.D.Calif. Sept. 12, 1969).

2. " 'Continued absence' exists when the natural parent is physically absent from the home and the nature of the absence constitutes dissociation, that is, a substantial severance of marital and family ties [or] a definite interruption of or marked reduction in marital and family responsibilities and relationships compared to previously existing conditions. 'Continued absence' does not exist when one parent is physically absent from

the home on a temporary basis. Examples are visits, trips made in connection with current or prospective employment, active duty in the Armed Services."

3. Counsel for the State was uncertain of California's policy as to persons employed away from home. The Court does not express any opinion as to the validity of the State's exclusion or inclusion of this group from § 606 benefits.

The State suggests that the real cause of plaintiffs' distress is not the absence of their spouses but is rather the inadequacy of military pay scales. "Cause" is a nebulous term which in this case may well encompass the factor of low pay. But it also includes the disruption caused by precipitately depriving a man of his civilian employment, assigning him to duty posts to which dependents may not accompany him, and making it necessary for the mother to rely on the tender mercies of the military allotment system. Congress, in its traditional solicitude for the soldier and his dependents, has shown a realization that military service represents, for many families, a disruption or dissociation as great as that envisaged by both HEW and California regulations.

In interpreting any statute, the courts will presume if at all possible that Congress would not act in a manner offending due process reasonability. The interpretation of § 606 urged by California would raise serious questions under the equal protection and due process clauses of the Constitution. All legislative classifications must be reasonable in light of the goals of the statutory program of which they are a part. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Developments in the Law: Equal Protection, 82 Harv.L.Rev. 1067, 1077 et seq. It is difficult to see what legitimate goal is served by the classification here. California will give aid to the needy child of a prisoner whose term may be as little as ninety days. The state will also help the dependents of a divorced mother whose support payments from her absent husband are insufficient to meet basic needs. A parental spat may result in an informal separation of but a few weeks duration, but § 606 payments are available if dependent children are in want as a result thereof. But nothing is given to the needy child of a soldier who, often involuntarily, may remain away from home for as long as two years. This distinction might have been deemed rational at the time the AFDC program was instituted, when the armed services were composed of small numbers of long-term volunteers. It is doubtful whether it can pass muster today, when world tensions require the maintenance of large overseas contingents of draftees and non-career enlistees. See Chastleton Corporation v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924) (due process rationality to be judged in light of contemporary circumstances); and People v. Belous, 71 Cal.2d 954, 80 Cal.Rptr. 354, 458 P.2d 194 (1970) (same). This court will not reach the constitutional arguments advanced herein, but it finds them sufficiently compelling to warrant the conclusion that Congress did not intend its program to be administered in the manner chosen by California.

The Court therefore declares that California may not deny benefits under U.S.C. § 606 to otherwise eligible children by means of the conclusive presumption, embodied in the regulation cited above at note 2, that a parental absence is not "continued" if occasioned by service in the armed forces of the United States. Some military absences may indeed be temporary; there comes to mind the situation posed by the career serviceman who chooses not to bring his family to a duty station. But other military absences give rise to the needs the statute was designed to fill. Each case must be considered in light of all relevant factors. Damico v. California, cit. supra.

Accordingly, IT IS HEREBY ORDERED that defendants herein are enjoined from enforcing California Department of Social Welfare Regulation EAS section 42–350.1 in a manner inconsistent with the declaration entered above. Execution of this Order is stayed for a period of ten days to allow the defendants to file notice of appeal if they so desire, except that the temporary restraining order hitherto issued shall remain in effect as to plaintiffs Dones and Remillard. Further stays of execution will only be considered upon timely application to the Court.

Before: HAMLIN, U. S. Circuit Judge; CONTI and WOLLENBERG, U. S. District Judges.

CONTI, District Judge:

I dissent from the opinion of the majority.

This case involves the question of whether California may lawfully or constitutionally refuse to grant Aid to Families with Dependent Children (AFDC) benefits to needy families where the absence of a parent is due to his military service. This case does not involve the question of whether plaintiff's family is needy, as the family clearly falls within California's definition of what constitutes a needy family. The affidavits of the plaintiffs which have been filed herein are poignant indictments of both the military pay scales and the efficiency of the military allotment procedures. However, those inadequacies do not trigger an AFDC eligibility; their attacks should be on the military establishment rather than on the welfare administration of the State of California.

The question here presented is squarely one of the intent of Congress; the language of the statute and the rights of States to make their own rules in accordance with the Act without legislation by the Federal Courts.

California participates in the Federal Government's AFDC program, which was established by the Social Security Act of 1935. The Act's purpose is to aid needy children who have been deprived of parental support or care by reason of the death, continued absence from the home, physical or mental incapacity of a parent.

The State of California, in order to receive Federal funds for the AFDC program, is required to submit a plan to the Secretary of Health, Education and Welfare (HEW). The plan must conform to the Social Security Act and to the regulations promulgated by HEW.

The legislative history of the original Social Security Act discloses an intention to leave considerable flexibility to the States in fashioning the eligibility standards to be applied in their AFDC programs. Thus, the committee reports, in discussing the prohibition in the Social Security Act, Sec. 402(b) of durational residence requirements in excess of one year, state:

"The State may be more lenient than this, if it wishes. It may, furthermore, impose such other eligibility requirements—as to means, moral character, etc.—as it sees fit."

H.R.Rep.No.615, 74th Cong., 1st Sess. 24 (1935). S.Rep.No.628, 74th Cong., 1st Sess. 35–36 (1935)

The Congressional debates shed light on another dimension of the same question. One element of the definition of "dependent child" in the original Sec. 406,[1] as now, is that the child be living in the home of one of the relatives enumerated in the Act. However, it was clear the States might choose to exclude children living with certain of those relatives:

"A State will not have to aid every child which it finds to be in need. Obviously, for many States, that would be too large a burden. It may limit aid to children living with their widowed mother, or it can include children without parents living with near relatives. The provisions are not for general relief of poor children but are designed to hold broken families together." 79 Cong.Rec. 9269 (1935). (Remarks of Senator Harrison)

While there is no legislative history containing comparable statements with

---

1. Sec. 406 when used in this title—
   "(a) The term 'dependent child' means a child under the age of sixteen who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle or aunt, in a place of residence maintained by one or more of such relatives as his or their own home;
   (b) The term 'aid to dependent children' means money payments with respect to a dependent child or dependent children."

respect to age, (1) the intent to leave the description of eligibility to the States in the areas documented above and (2) the fact that the list of relatives and the age limit are dealt with in parallel fashion in the definition of "dependent child", support the conclusion that similar latitude was to remain available to States to impose lower age requirements. And there is *no* affirmative evidence to support an argument that age should be treated any differently from any other element of the definition.

*The general intention of the Congress is indicated by the language contained, then and now, in Sec. 401 and corresponding sections of the other titles of the Act, that the purposes of the statute are directed to "enabling each State to furnish financial assistance, as far as practicable under the conditions in each State," to needy dependent children or the other designated groups.*

*Whether a state would cover all those encompassed by the Federal matching definition depends on what, from the State's viewpoint, is practicable in the State, whether such coverage relates to an age limit or participation in a particular program, such as Aid to the Blind.*

Further, it should be noted that the Congress did consider and legislate with respect to the matter of exclusions of dependent children from the program. Under Sec. 402(b) the Department could not approve any plan which imposed a durational residence requirement of a year or more. This was done with the knowledge that many States were currently implementing, in their own relief programs, eligibility requirements which demanded residence far in excess of one year. In summary, the Congress directed approval of any State plan for Aid to Dependent Children which complied with the requirements of Sec. 402(a), and did not contain any of the restrictions prohibited by Sec. 402(b). Neither of these subsections dealt (nor does either currently deal) with the question of age limits below those adopted to delineate the bounds of Federal matching.

The statutory pattern of Title IV, part A, and its legal implications are repeated and reinforced in the other public assistance titles of the Social Security Act.

Title I of the Social Security Act,[2] authorizes the Federal-State program for Old-Age Assistance. In the original act the statutory pattern of Title IV was followed in Title I. However, with respect to the aged, the Congress did not wish to give the States freedom to set eligibility requirements predicated upon age. Thus, while the Act defined "old-age assistance" (i. e., those payments by States which would earn Federal matching) as "money payments to aged individuals," Sec. 2(b) (which corresponds to Sec. 402 (b) in Title IV) prohibited approval of a plan which imposed an age requirement of more than 65.[3]

Similarly Title X,[4] establishing the program of Aid to the Blind, shows a Congressional awareness of the issue of permitting an age limitation. Unlike the program of old-age assistance, Sec. 1002(b) (corresponding to Secs. 2(b) and 402(b)), which enumerated the limitations on eligibility, contained no provision relating to age. As is apparent from the legislative history of Title X, the Congress was aware of this omission. The Senate Report said:

"The liberality of the eligibility requirements, which a State plan must contain, are worded in a similar fashion to paragraphs (2) and (3) of section 3(b) [pertaining to old age assistance plans]. These relate to residence and citizenship. In the State plan for aid to the blind no limitation is placed upon any age requirement which the State may impose." S.Rep. No.628, 74th Cong., 1 Sess. 52 (1935).

---

2. 42 U.S.C. § 301 et seq.

3. Except that, until January 1, 1940, States were allowed to impose a requirement of 70 years.

4. 42 U.S.C. § 1201 et seq.

Several conclusions follow logically from the foregoing:

(1) In 1935 Congress was aware of the possibility that States would impose conditions based on age as part of the eligibility requirements for the Federal-State public assistance programs;

(2) Congress legislated without ambiguity where it wished to express a policy in this regard (e. g., Old-Age Assistance); and

(3) The statutory provisions prohibiting exclusion (or requiring inclusion) of all members of a certain class were placed in Sections 2, 402, and 1002, the sections pertaining to State plans. Consequently the question of an individual's eligibility vis-a-vis the State was never dealt with in the definitions contained in Sections 6, 406 and 1006, which only set forth the outer limits of Federal financial participation.

> Equitable treatment of individuals within a Congressionally-defined class requires reasonable classifications in light of the purposes of the Act and Section 406(a) may be relevant to the determination of reasonableness.

Although the States are given wide latitude to frame eligibility standards for their public assistance programs, their discretion is not absolute. States have always been limited by the enumeration of certain prohibited eligibility conditions discussed supra. In addition, since the earliest days of the administration of the Social Security Act, the states' freedom to fashion their programs has been circumscribed by what has come to be known as the (constitutional) doctrine of equitable treatment.

Soon after the enactment of the Social Security Act it became apparent that administrative interpretation would be necessary in order to preclude the States from making unreasonable classifications within their public assistance programs. The principle requiring that States provide equitable treatment of persons in like circumstances was formulated, based upon a principle of Constitutional law, the overall purpose and intent of the public assistance titles, the legislative history of the Act and individual plan requirements. This principle has been applied repeatedly over the past thirty-three years.

It has been applied by the Department to prohibit arbitrary exclusions of persons who come within the scope of the matching definition, where the criteria upon which the exclusion is based bear no reasonable relationship to the purposes or scheme of the Federal statute. For example the Department has consistently refused to allow States to fashion their public assistance plans to exclude Indians or illegitimate children, as such. Since the criteria set out in the definitions in Section 406 are often indicative of the objectives of the program, they may have a bearing on the conclusion which the Department reaches concerning whether a particular State eligibility requirement results in equitable treatment.

Thus, while Section 406 enumerates various relatives with whom the needy child must be living, States are not required to include all such relatives within their implementing definition of "dependent child." It is clear that one of the original purposes of Title IV was to provide assistance to needy children living in homes in a family-like setting and it has not been considered inconsistent with equitable treatment for a State to exclude children who are living with relatives of the most distant degree of relationship enumerated in the statute.[5] Conversely, were a State to propose a definition of "dependent child" for purposes of its AFDC program which included children living with any of the enumerated relatives *except* the natural mother or father, such a proposal would be unacceptable to the Department. It would not violate any express provision of Title IV but clearly would be so contrary to one of the purposes of the statute as to be violative of equitable treatment.

---

5. Such a result is clearly supported by the remarks of Senator Harrison, supra, p. 3.

Since a State may narrow the definition of "dependent child" for purposes of establishing criteria for its AFDC program, so long as it does not result in an unreasonable classification, the failure of a State to take advantage of a liberalization of the definition by the Congress is not considered unreasonable. In other words, if a State elects to retain a classification that had, prior to an amendment to Title IV, set the outer bounds of Federal matching, that classification cannot be said to be inconsistent with the purposes of the Act since it represents a classification previously made by the Congress.

HEW interprets the "continued absence" requirement for "dependency" and AFDC eligibility in a fashion consistent with the above. HEW's interpretation of the continued absence requirement is set forth in Part IV of the Department's Handbook of Public Assistance Administration", which, in Section 3422.2 thereof provides as follows:

"3422. *Continued Absence of the Parent from the Home.*

3422.2 *Interpretation.*—Continued absence of the parent from the home constitutes the reason for deprivation of parental support or care under the following circumstances:

1. When the parent is out of the home;

2. When the nature of the absence is such as either to interrupt or to terminate the parent's functioning as a provider of maintenance, physical care, or guidance for the child; and

3. When the known or indefinite duration of the absence precludes counting on the parent's performance of his function in planning for the present support or care of the child.

A child comes within this interpretation if for any reason his parent is absent, and this absence interferes with the child's receiving maintenance, physical care, or guidance from his parent, and precludes the parent being counted on for support or care of the child. For example: the child's father has left home, without forewarning his family, and the mother really does not know why he left home, nor when or whether he will return. Within this interpretation of continued absence the State agency in developing its policy will find it necessary to give consideration to such situations as divorce, pending divorce, desertion, informal or legal separation, hospitalization for medical or psychiatric care, search for employment, employment away from home, service in the armed forces or other military service, and imprisonment."

It must be noted that the HEW interpretation is a strict one. The absence must be such as "to interrupt or to terminate the parent's functioning as a provider" and the "duration of the absence precludes counting on the parent's performance of his function." HEW gives as an example of the type situation falling within its interpretation the case where the father deserts the family and disappears. Thus, HEW treats the "continued absence" situation as something akin to death or incapacity, treating all three situations alike, requiring that dependency of a needy child arises only upon a serious and substantial destruction of the expectation of economic protection being available to a child from his parent.

It is clear since in Section 3422.2, HEW specifically defers to the states to determine whether as a matter of *state* policy, service in the armed forces will be treated as "continued absence." Under Section 3422.4 Federal financial participation is available *if* the state includes military-duty absence within its eligibility policy, but HEW requires only that "within this interpretation [by HEW] of continued absence the state agency in developing its policy will find it necessary to *give consideration* to such situations as * * * service in the armed forces or other military service

* * *." HEW Handbook, Part IV, Sec. 3422.2 supra.

Therefore, HEW allows the State to go either way:

(1) To include servicemen; or

(2) To exclude servicemen.

California chose to exclude servicemen, and it was within its legal right to do so.

The serviceman category is a distinct and separate entity apart from the groups alluded to. Service people are transitory in nature and could pose a serious problem to the taxpayers of a state. For example, suppose the U. S. Army saw fit to move the majority or large numbers of its forces into the State of California, in said event the taxpayers of California would have to bear the additional costs of allowing AFDC grants, which could, and probably would, bankrupt the State. The HEW regulations gave the states a choice and the choice is a proper and legal one (some states have granted aid to the families of servicemen, others, along with California, have not).[6]

The Congress and HEW could have just as easily made *mandatory* inclusion of servicemen within the interpretation of continued absence from the home. They chose not to do so.

Some may feel that the exclusion of servicemen's children from AFDC eligibility may be a manifestation of unsound social policy, but the Fourteenth Amendment can no longer be brought to empower federal courts to strike down state laws "because they may be unwise, improvident, or out of harmony with a particular school of thought." Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). In this "era of priorities" it is encumbent upon and the duty of states, in the utilization of its tax dollars, to be ever vigilant of the welfare of its *total* citizenry. In this case, the plight of the plaintiffs should be directed to the rightful source, the U. S. Government * * * to do otherwise would be in violation of the state's right to exercise its right of choice under the law. California has done nothing more than exercise its right of choice after having given decision to the categories of consideration as set forth in the HEW Regulations Sec. 3422.2.

I would find that the California Department of Social Welfare Regulation EAS Sec. 42–350 is constitutional, and that defendants are entitled, therefore, to a judgment in their favor as a matter of law.

---

6. A State Survey submitted by plaintiffs in Stoddard v. Fisher, Civil No. 11–168 (S.D.Maine) which indicates:

(1) Twenty-two states give aid to all servicemen's families (Alaska, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Indiana, Kansas, Massachusetts, Nebraska, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Virginia);

(2) Twenty-one states give no aid to the families of servicemen (Alabama, Arkansas, California, Florida, Georgia, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, New Hampshire, New Mexico, Puerto Rico, South Carolina, South Dakota, Texas, West Virginia, Wisconsin, Wyoming);

(3) Two states limit aid to the families of draftees (Idaho, Maine);

(4) Two states limit aid to the families of draftees or enlistees who have enlisted in order to avoid the draft (Iowa, Vermont);

(5) Five states did not participate in the survey (Kentucky, Nevada, Tennessee, Utah, Washington). Of these last five states, the Bureau of Social Science Research in Washington, D.C. has submitted to plaintiff information that Kentucky, Utah and Washington do grant AFDC to Military families. This brings the total number of states that do grant AFDC benefits to military families to twenty-five.