Constance JAMES, Individually and on behalf of others similarly situated, and Philadelphia Welfare Rights Organization, by its Executive Director Louise Brookins, on behalf of its members and all others similarly situated

v.

Helen O'BANNON, Individually and as Secretary of DPW, and Don Jose Stovall, Individually and as Executive of the Philadelphia County Board of Assistance, et al.

Civ. A. No. 82–1588.

United States District Court,
E.D. Pennsylvania.

June 18, 1982.

Stephen F. Gold, Philadelphia, Pa., for plaintiff James.

Richard Weishaupt, Community Legal Services, Philadelphia, Pa., for plaintiff PWRO.

John O.J. Shellenberger, Deputy Atty. Gen., Chief, Eastern Region, Philadelphia, Pa., for defendants O'Bannon and Stovall.

Diane C. Moskal, U.S. Dept. of Health and Human Services, Philadelphia, Pa., for defendant Schweiker.

LOUIS H. POLLAK, District Judge.*

In this action the plaintiffs are Constance James and Philadelphia Welfare Rights Or-

* This is a modestly edited version of an opinion delivered from the bench on June 18, 1982. To the extent of any discrepancies, this version is to be taken as the court's opinion.

ganization. They have brought this lawsuit seeking a declaratory judgment and injunctive relief on behalf of themselves and on behalf of a class.

The class which is selected to be certified is a class of all Pennsylvania households which have earned income who have applied for or who are receiving assistance pursuant to the Aid to Families of Dependent Children Program, the Program popularly known as AFDC.

The Philadelphia Welfare Rights Organization is an organization of mass membership including large numbers of persons who would be within the proposed class.

Constance James is one such person. She is a working mother who is a recipient of AFDC supplemental assistance.

The complaint in this matter was filed somewhat over two months ago, on April 8. The named defendants were Helen O'Bannon, the Secretary of the Pennsylvania Department of Public Welfare, and Don Stovall, who is the county official here in Philadelphia charged with administering the AFDC program in Philadelphia.

At a conference in chambers on the 9th of April, I granted Constance James' motion to proceed in forma pauperis.

The plaintiffs' motion for a temporary restraining order was withdrawn in light of the surfacing of an opinion in the District Court in Maine by Judge Cyr in *Dickinson v. Petit,* 536 F.Supp. 1100 (1982).

The fact of that decision which represents in substance a rejection of the position which plaintiffs here are espousing was a counter-balance to the somewhat earlier decision in the Southern District of New York which plaintiffs were and have continued to be strongly reliant upon. The decision in New York is *RAM v. Blum,* 533 F.Supp. 933. That's a decision by Judge Wood of the Southern District of New York.

On the 14th of April, the plaintiffs refiled or renewed not a motion for a temporary restraining order but a preliminary injunction and argument was held on that motion on the 16th of April. Meanwhile, the Pennsylvania defendants, Secretary O'Bannon

and Mr. Stovall, had moved to join as an additional party defendant, the Honorable Richard Schweiker, Secretary of the Department of Health and Human Services. That motion I granted, and since that time Ms. Moskal has entered her appearance for and served as vigorous advocate of Secretary Schweiker's position, helping to enlarge and illuminate the debate very usefully.

As of April 16, because we did not have the views of Secretary Schweiker, and the record did not seem in its other respects to be a really fit vehicle for determining the motion for preliminary injunction, I requested the parties to submit further briefs. Such further briefs, to which have been appended various documentary exhibits, have been submitted, and oral argument was held on the basis of those further submissions yesterday, June 17.

█ At the outset this afternoon I think it appropriate to rule on the motion by plaintiffs for class certification. There appears to be no opposition to that motion, and there would appear to be no sound basis for opposing it. It seems evident that various conditions of a class certification set forth in Rule 23(a) and 23(b)(2) are fully met here. Regrettably, a fact of society is more than adequate numerosity in the class of AFDC applicants and/recipients. The central legal issue is one that is common to all members of the class.

Plaintiff James' claim would appear to be typical of the claims, and plaintiff James is most assuredly represented by counsel highly versed in these problems and well qualified to carry the banner of the class. So, with plaintiff James as class president, as it were, the motion for class certification of the class as described will be granted.

I would note that class certification was authorized in the two cases to which I have referred—Judge Ward's *RAM v. Blum* in the Southern District of New York, and Judge Cyr's case, the *Petit* case in Maine.

█ I turn now to the motion of the Commonwealth defendants for judgment on the pleadings. In the expanded state of

this record, I am treating that as a motion for summary judgment pursuant to Rule 56.

To rule on the motion, I think it would be helpful to give some description of the background of plaintiffs' claim. Briefly put, it is plaintiffs' contention that Pennsylvania's newly promulgated method for calculating the income of a family receiving supplemental AFDC assistance fails to conform with federal requirements. Specifically, it is plaintiffs' argument that Pennsylvania is bound by what plaintiffs contend to be long-standing federal statutory provisions and regulations to consider only net income which is actually available for current use when calculating the income level of AFDC recipients.

The contention as phrased comes into focus as a critical contention at the point at which it is translated into plaintiffs' central position namely, that to comply with the requirement of considering only that income which is actually available for current use Pennsylvania must exclude from its calculation of an AFDC applicant's income any and all mandatory payroll deductions: that is to say, deductions for federal, state and city income and wage taxes withheld at the source, and Social Security taxes also withheld.

According to the plaintiffs, because the portion of one's total income which is withheld due to such mandatory payroll deductions isn't currently available for immediate use, it may not under a proper reading of the federal statute and supporting regulations be counted as part of a family's income in determining the eligibility for, and, if eligible, the proper level of AFDC assistance.

Now, in order to analyze these contentions it will be necessary to explore in some detail the statutory and, indeed, the regulation framework of AFDC.

A convenient summary which can be used as a predicate is taken from, with proper attribution, the Supreme Court. In *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120, the Court described the program as follows:

The AFDC Program is designed to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them. A principal purpose of the program, as indicated by 42 U.S.C. Section 601, is to help such parents and relatives "to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection ...." The program "is based on a scheme of cooperative federalism," *King v. Smith,* 392 U.S. 309, 316 [88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118] (1968). It is financed in large measure by the Federal Government on a matching-fund basis, and participating States must submit AFDC plans in conformity with the Act and the regulations promulgated thereunder by the Department of Health, Education and Welfare (HEW). The program is, however, administered by the States, which are given broad discretion in determining both the standard of need and the level of benefits. [Citations omitted].

Under HEW regulations all AFDC plans must specify a statewide standard of need, which is the amount deemed necessary by the State to maintain hypothetical family at a subsistence level. Both eligibility for AFDC assistance and the amount of benefits to be granted an individual applicant are based on a comparison of the State's standard of need with the income and resources available to that applicant. 45 C.F.R. § 233.-20(a)(2)(i). The "income and resources" attributable to an applicant, defined in 45 C.F.R. §§ 233.20(a)(6)(iii–viii), consist generally of "only such net income as is actually available for current use on a regular basis ... and only currently available resources". 45 C.F.R. § 233.-20(a)(3)(ii)(c). See also HEW Simplified Methods for Consideration of Income and Resources (1965). In determining net income, any expenses reasonably attributable to the earning of income are deducted from gross income. 42 U.S.C. § 602(a)(7). If, taking into account these deductions and other deductions not at issue in the

instant case, the net amount of "earned income" is less than the predetermined statewide standard of need, the applicant is eligible for participation in the program and the amount of the assistance payments will be based upon that difference. 45 C.F.R. §§ 233.20(a)(3)(ii)(a) and (c).

Mr. Justice Powell's careful exposition for the Court in *Shea* is better than any précis or paraphrase in setting a description, a backdrop, for the discussion which follows.

Now, because of the mechanism to which Justice Powell referred of comparing a standard of need with income, the calculation of a family's earned income level is critically important in determining eligibility for, and, if eligible, the level of AFDC assistance. In brief, the greater the family's income, the less assistance it will receive from AFDC, and if the family income is too high, of course, there will be no eligibility.

Now, the manner in which states calculate a family's income level was significantly changed by the piece of legislation in 1981 called the Omnibus Budget Reconciliation Act of 1981, more familiarly known as OBRA.

Now, much of the dispute between the parties in this case centers on these 1981 changes in the AFDC program, as those changes were accomplished by OBRA. Hence, the protection of the AFDC income calculation methods both pre- and post-OBRA require some exploration.

Before OBRA, the starting point for calculating a family's income was the requirement of section 402(a)(7) of the Act, the section referred to by Justice Powell as 42 U.S.C. section 602(a)(7), that:

A state plan for aid and services to needy families with children must [exceptions referred to in Clause 8] provide that the state agency shall, in determining need, take into consideration any other income and resources of any child or relative. . . .

Now, this statutory language was added in 1939 to the Social Security legislation originally adopted by Congress in 1935, and it has remained the same since, but before the enactment of OBRA in 1981, in addition to this mandate to consider income adopted in 1939, Congress had provided that states make two principal deductions, or what are known in the welfare jargon as "disregards," from a recipient's income in calculating the level of need.

The first disregard provision was added in 1962 amendments to the Social Security Act. This amended section 402(a)(7), the provision from which I have just quoted, by adding the phrase, "as well as any expenses reasonably attributable to the earning of such income," so that the entirety was a directive to the states to take into consideration any other income and resources as well as any expenses reasonably attributable to the earning of such income.

Now, this 1962 amendment was an open-ended provision which required states to disregard from a recipient's income such work-related expenses as, by way of most obvious example, transportation to and from the jobsite, special clothing as required by a job, child care expenses to make the employee able to leave the home and to go to the jobsite, and so forth. This was commonly known as the "work expense disregard."

Now, a second disregard provision also relevant to this litigation was added in the 1968 amendments to the Social Security Act. This particular additional disregard was contained in an amendment providing in Section 402(a)(8) of the Act that states would apply a "work incentive" disregard by deducting $30 plus one-third of the remainder from a recipient's income in calculating the level of assistance.

Now, the general purpose of both of these provisions was to insure that AFDC recipients were not discouraged from increasing their earned income while receiving assistance; that is to say, they were provisions intended to make sure that an AFDC recipient would not by working make himself ineligible for AFDC assistance, or reduce

his level of assistance with respect to items of asserted income which were not in fact realistically the recipient's.

These new statutory provisions were complemented by regulations promulgated by HEW and more recently by HHS. These so-called "earned income disregard" regulations are published at 45 C.F.R. Section 233.20(a)(6). These regulations have defined income in the following way:

> A state plan must ... [p]rovide that for purposes of disregarding earned income the agency policies will include: (i) A definition of "earned income" in accordance with the provisions of paragraphs (a)(6)(iii) through (viii) of this section...

> (iv) With reference to commissions, wages, or salary, the term "earned income" means the total amount, irrespective of personal expenses, such as income-tax deductions, lunches, and transportation to and from work, and irrespective of expenses of employment which are not personal, such as the cost of tools, materials, special uniforms, or transportation to call on customers.

> (v) With respect to self-employment, the term "earned income" means the total profit from business enterprise, farming, etc., resulting from a comparison of the gross income received with the "business expenses," i.e., total cost of the production of the income. Personal expenses, such as income tax payments, lunches, and transportation to and from work are not classified as business expenses.

45 C.F.R. § 233.20(a)(6)(i)–(v).

Now, these regulations at 45 C.F.R. 233.-20(a) then go on to describe the manner in which the work incentive disregard and the work related expense disregards which have been mandated by sections 402(a)(7) and (8) of the Act were to be applied.

45 C.F.R. 233.20(a)(7)(i) went as follows:

> A state plan must ... [p]rovide that the following method will be used for disregarding earned income: The applicable amounts of earned income to be disregarded will be deducted from the gross

amount of "earned income", and all work expenses, personal and non-personal, will then be deducted. Only the net amount remaining will be applied in determining need and the amount of the assistance payment.

. . . .

In summary, the effect of these regulations, for treatment of income and expenses ... is as follows: For earned income from regular employment ... the first $30 plus one-third of the remainder are disregarded, and work-related expenses are then deducted from the remaining income.

42 C.F.R. § 233.20(a)(11)(v)(a).

To summarize, under the pre-OBRA regulations, a state began with a family's earned income broadly defined as gross income, see 45 C.F.R. § 233.20(a)(6)(iii) and then applied the $30 plus one-third work incentive disregard and finally the work expense disregard. The resultant figure gave a net amount which would be used in determining need and the amount of assistance. See 45 C.F.R. 233.20(a)(7)(i).

Now, as mentioned earlier, OBRA, the 1981 legislation whose impact is at issue here, introduced a number of changes into this system. Principally, OBRA amended 402(a)(7) and (a)(8) by first eliminating the open-ended disregard for work-related expenses, and, second, instituting a new set of standardized disregards which were to be applied in a new sequence.

Now, following these changes in the governing statutory provisions, HHS promulgated a new set of regulations governing earned income disregards. These are to be found by Volume 47 of the Federal Register 5648 to 86 (February 5, 1982).

The new regulations retained precisely the same broad definition of "earned income" which was to be found in the pre-OBRA regulations. The principal change in the regulations was a new regulation setting forth a set of new disregards to be applied to earned income:

For purposes of eligibility determination the state must disregard from the monthly earned income of each individual whose needs are included in the eligibility determination ... the first $75 (or a lesser amount in the case of an individual not engaged in full-time employment or not employed throughout the month). The state must also disregard [a]n amount equal to the actual cost, but not to exceed $160 ... for the care of each dependent child ... living in the same home and receiving AFDC.

Where appropriate, an amount equal to $30 plus one-third of the earned income not already disregarded of an individual who received assistance in one of the four prior months.

Now, to summarize, under the new regulations a state, in calculating the level of need, again begins with "earned income" as defined in the regulation which we have already considered, 233.20(a)(6)(iii), but then it first applies a standardized $75 work expense disregard; second, it applies a child care disregard, which is up to a figure of $160 per child, $160 monthly per child as a ceiling and, finally, it applies the $30 plus one-third work incentive disregard, but with the proviso that the latter is limited to the first four months of eligibility.

Now, with this long preface, suffice it to say it is the change in the work expense disregard provisions of the Act and the concomitant regulations which has triggered this litigation.

Now, prior to OBRA, Pennsylvania had allowed mandatory payroll deductions to be included as part of the then open-ended work expense disregard. The way the Pennsylvania procedure worked pre-OBRA was as follows:

First, this is pursuant to Section 183.44(e) of the Pennsylvania regulations which took effect in September of 1980. As an incentive to eligible AFDC clients to obtain and retain employment, the first $30 of the total monthly gross earned income in the grant group, cash or income-in-kind, plus one-third of the remainder was disregarded. *See* Pennsylvania Department of Public Welfare's Public Assistance Eligibility Manual § 183.44(e) (September 10, 1980).

Next—and next is under 183.44(f)(2)— under the calculation of work expense, the following deductions were made from the earned income of each AFDC client according to the type of income:

(i) Wages and Training Allowances. From gross wages, commissions, bonuses, and training allowances, the following will be deducted:

(A) The actual deductions made by the employer for expenses over which the client has no control, such as, social security, income withholding tax and wage tax.

*Id.* § 183.44(f)(2)(i) (March 15, 1977).

Now, after OBRA took effect, Pennsylvania revised its public assistance regulations. According to defendants O'Bannon and Stovall, these changes were made so that Pennsylvania's administration of the AFDC program would comply with the new Federal statute and HHS regulations. Unlike the pre-OBRA regulations, the new Pennsylvania rules did not permit a disregard for mandatory payroll deductions and instead simply allowed a standard $75 disregard for full-time workers and a $55 disregard for part-time workers, and this is set forth in 183.44(d), which took effect on November 7, 1981. That is to say, under work expense deductions the new regulations provided for a wage allowance of $75 per month of earned income of each client who was employed full time and $55 per month for part-time workers.

It is plaintiffs' contention that Pennsylvania's new rule has the effect of substantially reducing AFDC assistance payments because it (a) includes as income mandatory payroll deductions which had previously been disregarded and (b) only allows a total disregard of $75 for work expenses when that figure is frequently much less than most recipients were able to disregard under the previous regulations and would, but for the new regulations, be in a position to continue to require the disregard of.

It is the Pennsylvania inclusion of mandatory payroll deductions which hitherto had been disregarded which is the focus of plaintiffs' claim in this case.

Reduced to its essentials, plaintiffs' claim is that the Pennsylvania work expense regulation to which I have just referred, which removes mandatory payroll deductions from the disregard category, is not justified, let alone required, by OBRA's statutory changes or by the associated newly adopted earned income disregard regulations. 45 C.F.R. § 233.20(a)(11).

Instead, plaintiffs contend that the Pennsylvania rules violate another set of long-standing HHS regulations which require states to consider only income and resources which are "actually available" to the recipient. *See* 45 C.F.R. 233.20(a)(3)(ii)(D). Because in plaintiffs' view the portion of an AFDC recipient's total income which is withheld due to mandatory payroll deductions is not "actually available" within the meaning of the regulation to which I have just referred, a state may not include mandatory payroll deductions as part of a recipient's income when calculating the level of need or eligibility itself. Thus, plaintiffs claim that by counting mandatory payroll deductions as part of an AFDC family's income, Pennsylvania has run afoul of the availability rule enshrined in the regulation, and, as plaintiffs contend, required by the statutory framework.

Now, to support this position, plaintiffs focus strongly on the early history of the Social Security Act. In particular, they cite the legislative history of the 1939 amendments which, for the first time, required states to give consideration to a recipient's income in calculating need.

Now, as plaintiffs observe, the early interpretation of this 1939 statutory change provided by the Social Security Board a year later, in 1940, makes it pretty clear that the states were only to consider income that was actually available for current use. The plaintiffs point to a memorandum dated December 20, 1940, from the Acting Secretary to the Board, Leona McKinnon. Now, in addition, the plaintiffs rely on the

line of cases which commence with Chief Justice Warren's decision in *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), and which follow on with *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970), *VanLare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975), most particularly a discussion at 345–47, 95 S.Ct. at 1746–47. *King v. Smith* was a case in which the Court struck down an Alabama so-called "substitute father" regulation which denied AFDC benefits to the children of a mother who co-habited with a person not her husband.

Now, though the focus of the Court's opinion in *King v. Smith* was on the proper interpretation of the word "parent" under section 406(a) of the Social Security Act, a good deal of the reasoning stressed the concept of "available" income as being at the heart of the AFDC program. This is particularly clear from footnote 16 on page 318 of volume 392 U.S., 88 S.Ct. at 2134 Footnote 16. *VanLare* and *Lewis v. Martin* were similar cases in which the Court struck down restrictive state definitions of income and of resources and strongly emphasized that a state could only consider income actually available to a child's household, rejecting attributive sources of income which had no longer, or not sufficient, economic actuality.

Now, the focus of this group of decisions was an HEW regulation, 45 C.F.R. section 233.20(a)(3)(ii)(c), which provided that:

> [O]nly such net income as is actually available for current use on a regular basis will be considered.

The concept involved here was strongly underscored in the leading opinion of Judge Tamm for the Court of Appeals of the District of Columbia, *NWRO v. Mathews,* 533 F.2d 637, 647 (D.C.Cir.1976). There, what was at issue was not a state practice but an HEW regulation which the Court of Appeals concluded was incompatible with the statute-based insistence on availability.

Now, the current HHS regulation that plaintiffs strongly rely on, section 233.-20(a)(3)(ii)(D), is clearly the successor to the

regulation to which I have just referred, and most of the "net income" and "currently available" language is retained. So the argument is that the basic *King v. Smith* approach survives and requires the invalidation of a Pennsylvania structure which has the effect of imputing to Mrs. James and those similarly situated dollars which never actually are received by them, namely, taxes and Social Security deductions withheld at the source.

Now, it is true, although I will not burden this oral opinion with reading further from texts of regulations, that the pre- and post-OBRA regulations with respect to availability are, though slightly discrepant in wording, substantially identical in import as to the concept of availability and the requirement that a state plan so conform.

Now, the argument that plaintiffs make has considerable surface appeal, but I am persuaded that the position is one which is ultimately undercut both by the legislative history of the AFDC amendments, as that Act has been successively modified, and by the history of administrative practice with respect to mandatory payroll deductions.

Let us begin with the period 1940 to 1962. Under the 1939 amendment, which required the states to give consideration to a recipient's income, there was no corollary requirement that the states take account of work-related expenses, and the plaintiffs have not been able to cite any evidence, as I comprehend the materials that have been submitted, that would show that as a general matter states were disregarding mandatory payroll deductions when they, in compliance with the statute, gave consideration to income as they were required to do under section 402(a)(7). That is to say, that in that twenty-year period before the states were instructed that work expenses were to be disregarded in the calculation of the recipient's income, there is no demonstration that the states understood or that the administrators of the Social Security program in Washington tried to make the states understand that the state obligation in considering income was to look to income net of mandatory payroll deductions. In

viewing that supposed obligation, it is well to remember that in 1939, when the statutory language in 402(a)(7) was enacted, the principal form of mandatory payroll deduction was that for FICA, that is to say, the Social Security deduction, a modest one at that time. That is to say, the 1939 amendment to the Social Security Act predated by some two or three years the withholding of federal income taxes.

It is hard to recall that there was a pre-withholding era, but there was for a time, namely, from 1913 to the early 1940s. There was such a thing as a federal income tax, but one paid it at the end of the year, not as one went along, and, indeed, of course, the burden itself was a much smaller one.

Now, the plaintiffs have relied rather heavily on the 1940 policy statement of the Social Security Board in support of their position that the Social Security Board understood that income was to be net of mandatory payroll deductions. I do not read that document in the same way that plaintiffs do. I can't say that it contradicts plaintiffs' contentions, but I don't think it really addresses them in any central way. I think the thrust of the Social Security Board's concerns lay in a different direction. The Social Security Board, it is evident from the 1940 exposition, was concerned about two things:

One, it was concerned to see to it that the states did not ignore income which recipients had apart from their AFDC receipts, the Board pointing out that public assistance is intended to supplement rather than replace any available or continuing income or resources.

And, second, and at considerable length, the Social Security Board was trying to make sure that the states would not, in identifying other sources of income, in determining both eligibility and level of assistance, essentially establish fictionalized or attributive sources of income or resources which would tend to deny aid to people genuinely in need, and that latter set of principles I think is clearly at the heart of subparagraphs (a) and (b) of the December 1940 statement on page two thereof.

Though I don't think it cripples, I do not think it really assists plaintiffs' effort essentially to read into the statutory mandate of 402(a)(7) the insistence that income as there understood by the Social Security Board was meant to exclude mandatory payroll deductions.

Now, when we turn to the period from 1962 to 1981, we move to that middle time span in which Congress added to the 1939 requirement that other income be taken into consideration, the further mandate that work expenses be considered and disregarded. Up until 1962, no such obligation was imposed by Federal law on the states. Between 1962 and 1981, it is apparent that the large majority of states which were part of the AFDC program permitted mandatory payroll deductions to be included as a work expense disregard. This becomes evident from an exhibit supplied by Secretary Schweiker and not, I think, contradicted by anything else in the record, the 1972 document entitled Summary of State Agency Policy on Expenses Reasonably Attributable to the Earning of Income. And that shows multiple examples of taxes and frequently Social Security charges and sometimes the entire characterization of mandatory payroll deductions being assimilated with union dues, transportation expenses, clothing, amounts required for special training or education, lunches, and so forth, as a work expense disregard.

Significantly, in my view, the Supreme Court in *Shea v. Vialpando,* to which I have already referred, noted that HEW supplied by brief to the Court—and that would have been 1973, when the case was pending—information containing essentially the same recital. Though one cannot tell from the footnote in *Shea v. Vialpando,* it's entirely possible that it was the very same submission. The point, however, is simply that at 416 U.S. 251, 255, note 3, 94 S.Ct. 1746, 1751, note 3, 40 L.Ed.2d 120, the Supreme Court took account of state practice which included mandatory payroll deductions in many instances as work-related expenses.

Similar evidences are to be found in the Second Circuit's opinion in *Connecticut De-*

*partment of Public Welfare v. HEW,* 448 F.2d 209, 216 (2d Cir.1971).

In short, there seems to be no reason to draw any other inference than that HHS is quite right in suggesting that the administrative practice throughout the 1962–81 period was to take account of mandatory payroll deductions as work-related expenses. It may be that in the early 60s that was less true than it came to be later on. I don't think the materials before me would entitle me to draw any clear inferences one way or another.

In the early 60s, I think 1964, HEW in circularizing the states with respect to work expense disregards didn't identify payroll deductions as part of that landscape. However that may have been and whatever significance attaches to that recital or non-recital, it is certainly not a statement that would not be an appropriate work expense disregard. The apparent fact is that as of the 70s this was commonly understood by the states to be an appropriate disregard and so accepted by HEW.

Now, third, the argument that plaintiffs make, relying heavily on the availability regulation, seems to overlook the fact that as a matter of, I think uniform administrative practice, disregards for earned income have been governed by the regulations discussed extensively hitherto and found in 45 C.F.R. § 233.20(a)(6). These regulations clearly indicate that all disregards were applied to gross income initially. See, for example, 233.20(a)(6)(iii), defining "earned income". And there is no provision anywhere in the regulations for the disregard of mandatory payroll deductions prior to the application of any other disregards.

The principle for which plaintiffs contend is, of course, that mandatory payroll deductions must be taken off the top before any attention is paid to work expense disregards, and, indeed, the principle would be that in the period prior to 1981, such mandatory payroll deductions would have to be taken off the top prior to the calculation of $30 plus one-third reduction from gross income.

Now, given that there are no provisions anywhere in the regulations for the disregard of mandatory payroll deductions before one gets to work-related disregards, one confronts, so it seems to me, if one is to follow plaintiffs' argument, the rather implausible situation that such detailed regulations as were developed for earned income would omit such an important step, if any such step, that is, was intended to be applied. The entire argument the plaintiffs are making takes as its predicate that income in the 402(a)(7) (42 U.S.C. § 602(a)(7)) sense was enshrined in the statute as a concept which was net of mandatory payroll deductions, and that very position—though I acknowledge that the *Shea* case was not addressing the particular issue that is before us—that very position is inconsistent with the description of the AFDC program which I have already quoted at length from by Justice Powell in *Shea,* in which he said, it may be recalled, in determining net income, any expenses reasonably attributable to the earning of income are deducted from gross income. And it seems evident that the Court through Justice Powell read income in 402(a)(7) as being a gross figure, just as the HHS regulations to which I have just referred characterizing earned income and the process of determining the ultimate net figure to be utilized by state agencies for defining eligibility and level of assistance commenced the calculation with a gross figure.

In short, it is my conclusion that the only reasonable interpretation of the regulations under the statutory framework that they were implementing is that mandatory payroll deductions were not treated independently of the earned income disregard which by common concession are covered by the statute and regulations—that is to say, such disregards as cost of transportation and special clothing, meals and so forth.

Now, fourth, a careful reading of the availability regulations in the *King v. Smith* line of cases on which plaintiffs have strongly relied suggests that these cases were principally addressed not to the kind of problem posed here but to the problem of unavailable sources of income. In general, these were cases which (a) struck down state regulations which attributed to an AFDC recipient income from a source that was not in fact obligated to provide income to the recipient as, for example, *Lewis v. Martin,* or (b) struck down state regulations which attributed to a recipient the full market value rather than the effective equitable value of resources which were encumbered in such a way as to prevent the attributed full market value from being realizable. That, for example, is the problem in *NWRO v. Mathews.*

Now, this potential problem of unfair or unreasonable attributions to the recipient of non-realizable values from resources of income—non-realizable in the sense that makes them not actually available—is a problem which is presumably still present or lurking, and it would seem that it is important for that reason that HHS has preserved the availability rule in the regulations relied on, but I find no evidence that the availability rule was applied in any of the cases to require disregards for particular portions of a recipient's actual gross income. There are, to be sure, certain state cases that look in a contrary direction. Most pertinent to this litigation would be the decision of the Commonwealth Court in 400 A.2d 669, the *Watson* case, *Watson v. Pennsylvania Department of Public Welfare,* and close in reasoning are two New York cases, *Harbolic v. Berger,* 43 N.Y.2d 102, 105, 400 N.Y.S.2d 780, 371 N.E.2d 499, and the matter of *Dumbleton v. Reed,* 40 N.Y.2d 586, 388 N.Y.S.2d 893, 357 N.E.2d 363.

The *Watson* case was a construction of the Pennsylvania State statute and regulations. *Dumbleton* and *Harbolic* were both constructions of New York statutes and regulations. It is true that *Dumbleton* proceeded to interpret the New York statute on the basis of the Court of Appeals' understanding of the federal statute. It is also true that *Dumbleton* was a divided court, as *Harbolic* was not, although I can't say that *Dumbleton* was divided precisely along the lines of whether the federal act was to be read as the majority felt it was to be.

However, I can say only that none of those cases seems to me to overcome the considerations which I have addressed here, and, indeed, no one of them examines the development of the Act and of the supporting regulations with perhaps the too great elaboration contained in this bench opinion very likely because those courts were not so singularly benefited as I have been by very able submissions by counsel on both sides.

Fifth, when ultimately analyzed, the position which plaintiffs take is one which insists that the Social Security regulation has from 1939 onward required a distinction nowhere enshrined in any Congressional text whose economic real world significance is very hard to appreciate. That is to say, plaintiffs' position requires the assertion that mandatory payroll deductions are somehow matters separate from, apart, wholly distinguishable from the kind of expenditures which the states routinely lumped together in the 60s and 70s, following Congress' requirement that the expenses of performing work be taken into consideration.

It is true that mandatory payroll deductions are the kinds of money which the earner never has her or his fingers on at all. That perhaps gives the earner a slightly different feeling than she or he has about money which comes to one and then immediately has to be paid out for gasoline or for food or child-care, or what have you.

But the economic distinctions seem elusive. Nor, I think, is plaintiffs' position aided when plaintiffs assert that what really is at stake are those deductions which are required by law, namely, taxes, both income and wage taxes, and Social Security taxes, which is meant thereby to distinguish withholdings of that kind from withholdings of other kinds, for example, Blue Cross, union dues, and so forth. At that point the operative distinctions from the point of view of the earner become so, it seems to me, metaphysical indeed.

I would say finally that if the plaintiffs' position were to be accepted, then the statutory implication would be that in the period from 1969 to 1981, if the Social Security Administration under HEW and HHS and the states had been doing their jobs properly, AFDC recipients would have received somewhat less than and in some cases be found not eligible at all for what otherwise was provided to them. That is to say, the plaintiffs' theory, as I have noted before, calls for mandatory payroll deductions to be disregarded before one moves to the statutorily required disregard that was added in 1968, $30 plus one-third. The practice which was evidently uniformly pursued by a great many states of lumping the mandatory payroll deductions in with concededly work-related expenses meant that they were within the dollar figure which the $30 plus one-third was calculated with respect to, and, therefore, AFDC recipients received the benefit of one-third of the dollar amount of the mandatory payroll deductions.

In short, what plaintiffs now seek as an entitlement is one which only emerged as a benefit to AFDC recipients in consequence of the OBRA change in the AFDC system, assuming, that is, the plaintiffs are right, as I believe they are not right, in their exposition of what income under 402(a)(7) means.

My ultimate view of the issue on the merits is that the understanding of Congress in adopting OBRA was the understanding which the Supreme Court announced in *Shea*, that income under 402(a)(7) was a gross figure. Congress was entitled to rely on the most authoritative descriptions of the AFDC system in deciding in 1981 what changes they chose to make, and it is hard to see how there could have been a more authoritative recital than that. Of course, if that recital had been controverted by other characterizations of an authoritative kind, such as, for example, recitals by the Secretary of HEW at the time of *Shea* or thereafter, or now the Secretary of HHS, then we would have a different legislative picture. But in his testimony before the House Ways and Means Committee last year, which plaintiffs have placed some reliance on, Secretary Schweiker again used the term "gross" in referring to the previous posture.

Secretary Schweiker had this to say in describing what was proposed by way of changes:

"The $30 and one-third now disregarded as a work incentive will be computed on net income rather than gross as is presently done and will not apply to earnings already disregarded for work expenses and child care." There may be ambiguity in that sentence with respect to the second clause: "and will not apply to earnings already disregarded for work expenses and child care." I think that I understand Secretary Schweiker to be simply, in effect, repeating himself in saying that there will be no application to earnings already disregarded, that is, repeating the previous phrase that the computations will be on net income rather than gross.

I don't, and I am not entitled to, insist on my construction of that clause, but I think I am entitled to insist on the Secretary's use of the term "gross" as describing the present practice. It is consistent, so it seems to me, with what the Supreme Court said in *Shea,* and with the HHS regulations and the previous HEW regulations on earned income, all focusing on the grossness of the income which the states are required under 402(a)(7) to give consideration to, and from which then appropriate work-related deductions are to be made from 1962 onward.

I have not discussed in this, I am afraid, over-long exposition, the two cases which are to my knowledge the only cases which have addressed the particular issues covered by this bench opinion. I have referred to both of them. They are Judge Ward's opinion in the Southern District of New York in *Ram v. Blum,* and Judge Cyr's in *Dickinson v. Petit,* in the District of Maine. Suffice it to say that Judge Ward takes a different view than mine, and his opinion ultimately focuses on his construction of the word "income" in 402(a)(7) as meaning net income and having meant that when Congress adopted the phrase in 1939, and maintaining that steady meaning ever since.

I think I have made it sufficiently clear that with all due respect to Judge Ward's

very careful exposition of matters which were brought before him in great haste, and I think without full briefing, his analysis of the meaning of 402(a)(7) is one which does not commend itself to me. I find myself much more in harmony with Judge Cyr's opinion in *Dickinson v. Petit* which chronologically follows Judge Ward's and which discusses Judge Ward's opinion, too.

For the reasons stated from the bench this afternoon, I will enter an order granting the plaintiffs' motion for class certification and defendant's motion for summary judgment, and, simultaneously with that, denying plaintiffs' motion for preliminary injunction.